1  Michael Tenenbaum, Esq. (No. 186850)
2  *mt@post.harvard.edu*
   THE OFFICE OF MICHAEL TENENBAUM, ESQ.
3  1431 Ocean Ave., Ste. 400
   Santa Monica, CA  90401
4  Tel    (424) 246-8685
5  Fax    (424) 203-4285

6  *Counsel for Plaintiff International Fur Trade Federation*

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  INTERNATIONAL FUR TRADE                Case No. _____
12  FEDERATION, an unincorporated
13  association;
                                           **COMPLAINT FOR
14                     Plaintiff,          DECLARATORY AND
                                           INJUNCTIVE RELIEF**
15       – against –
16                                         DEMAND FOR JURY TRIAL
17  CITY AND COUNTY OF SAN
18  FRANCISCO; and
19  DR. GRANT COLFAX, an individual, in
    his official capacity as Director of the
20  San Francisco Department of Public
21  Health;

22                     Defendants.

23

24

25

26

27

28

# SUMMARY OF THE CASE

1.      Fur is part of the fabric of our Nation, from its founding through the present day.  As every child learns in school, when the early settlers brought European goods to the New World, what the Native Americans traded for them were furs.  When Benjamin Franklin went to France to raise funds for the American colonists fighting arbitrary laws laid upon them by an English king, he did so wearing a hat and coat collar made from fur.  *See* Walter Isaacson, BENJAMIN FRANKLIN: AN AMERICAN LIFE 338 (paperback ed. 2004); https://www.metmuseum.org/press/exhibitions/2016/ benjamin-franklin.  When Abraham Lincoln traveled to Gettysburg to honor the sacrifices made there in dedication to a Nation that was "conceived in liberty," he did so wearing his signature stovepipe hat made from beaver fur.  Abraham Lincoln Presiden-tial Foundation, UNDER LINCOLN'S HAT:  100 OBJECTS THAT TELL THE STORY OF HIS LIFE AND LEGACY 194 (2016).  And when, 233 years later, Barack Obama was inaugurated as President of the United States, Americans broke out their furs to celebrate.  *See* Amy Chozick, *Inside the Peltway*, Wall Street Journal, Mar. 6, 2009 (noting prominent African-Americans among others wearing fur on Inauguration Day).

2.      This case is about San Francisco's ban on fur, added by Ordinance No. 55-18 as Article 1D of the San Francisco Health Code (the "Fur Ban"), which applies to all fur products as of January 1, 2020.  It is important to recognize at the outset what this ban is — and is *not* — about.  While the Fur Ban may be found in the city's Health Code, fur products are not a cause of harm to anyone's *health* in San Francisco, and the Fur Ban does not even claim that they are, since it would be especially silly to do so.  Nor do fur products pose any threat to the *safety* of anyone in San Francisco.

3.      Rather, in addition to how great they feel for the people who wear them (and for others who feel them), fur products — as defined under the Fur Ban to include, e.g., clothing, hats, earmuffs, scarves, and gloves — protect people from the cold.  Indeed, the Fur Ban does not prohibit people in San Francisco from possessing or wearing fur.  And it even allows used furs products to be sold.  So the Fur Ban in San

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Francisco is certainly not about the health or safety of *any human beings in San Francisco*.

4.    Moreover, in the City and County of San Francisco, not a single animal is raised for its fur.  Nor is any animal trapped for the purpose of selling its fur.  In fact, there were not even any fur farming or commercial trapping operations in San Francisco at the time the Fur Ban came before the San Francisco Board of Supervisors.  So the Fur Ban is certainly not about the welfare of *any animals in San Francisco*.

5.    Nevertheless, in an act of sanctimony, the San Francisco Board of Supervisors in April 2018 unanimously passed the Fur Ban.  Since January 1, 2019, the Fur Ban has made it unlawful to sell, offer for sale, display for sale, trade, give, donate or otherwise distribute a fur product "by any means" in San Francisco.  S.F. Health Code Art. § 1D.4.  The Fur Ban further makes it unlawful to manufacture a fur product in San Francisco.  *Id.*

6.    The Fur Ban lumps together *every* fur product from *every* fur animal, banning everything from a mink coat to a beaver hat to an ordinary rabbit's foot.  The Fur Ban's far-reaching sweep demonstrates that it is not really aimed at improving animal welfare, since it prohibits fur products regardless of what kind of animal the fur comes from — and regardless of how well the animal was treated during its lifetime.  Under the Fur Ban, even the fur from a fox that died of old age, safe in its den, cannot be sold in San Francisco.  Fur coats from minks raised under some of the world's highest animal welfare standards in Denmark?  Banned.  Nylon jackets with a little fur trim from coyotes humanely trapped under internationally-agreed standards in North Carolina?  Banned as well.

7.    The Fur Ban does make a host of exceptions.  While it claims that "[t]he sale of fur products in San Francisco is inconsistent with the City's ethos of treating all living beings, humans and animals alike, with kindness," some animals are apparently more equal than others, as that ethos does not apply to cows, lambs, or sheep, since the Fur Ban's definition of "fur" expressly excludes "cowhide with hair attached thereto; or

lambskin or sheepskin with fleece attached thereto." S.F. Health Code §§ 1D.2(i), 1D.3. Furthermore, the Fur Ban expressly excludes from the definition of "fur" the skins of any animal that "are to be converted to leather" with the "hair, fleece, or fur fiber completely removed." *Id*. And the Fur Ban even allows the sale of the skins of traditional fur animals — mink, chinchilla, sable, lynx, fox, rabbit, beaver, coyote — as long as the skins are deprived of their value by having the hair, fleece, or fur fibers removed. The Fur Ban also allows the sale of all *used* fur products from any animal, provided that the seller is a non-profit, pawn shop, or second-hand store or is someone not in the business of selling fur products. S.F. Health Code § 1D.4(c).

8.      The Fur Ban is so arbitrary as to be ridiculous — as in literally the subject of ridicule. As one commenter on a recent *New York Times* article observed, "It seems the height of hypocrisy to exempt leathers and shearling. … I suppose it's difficult to maintain 100 percent pure self-righteousness." The author of the Fur Ban herself perhaps symbolizes some of this in claiming not to eat meat while still eating fish and wearing leather, according to the *San Francisco Chronicle*. And she imposes no ban on herself: "But I try and limit my buying of them." Phil Matier & Andy Ross, *SF on Verge of Banning Sales of New Fur Clothes*, S.F. Chronicle, Mar. 19, 2018, available at https://www.sfchronicle.com/bayarea/matier-ross/article/SF-on-verge-of-banning-sales-of-new-fur-clothes-12762563.php. As one seller of leather products remarked when the Fur Ban was under consideration, "What's next? They're going to say that you can't have beef and you can't have pork and duck in Chinatown?" Associated Press, *San Francisco expected to ban fur sales, stirring backlash: 'What's next? They're going to say that you can't have beef?'* L.A. Times, Mar. 20, 2018, available at https://www.latimes.com/local/lanow/la-me-fur-sales-sf-20180320-story.html. But politicians are free to be ridiculous, and courts do not adjudge the *wisdom* of the laws they pass.

9.      Yet San Francisco's Fur Ban goes much farther than mere ridiculousness — it goes so far as to violate the Commerce Clause of the United States Constitution.

San Francisco uses the hook of concern about the treatment of animals — animals that are raised or killed for their fur — not to ban the sale and distribution of fur products from any animals raised or trapped in San Francisco but to ban the sale and distribution of fur products from all animals raised or trapped everywhere else in the world, no matter how well the animals were treated in *other states and countries*.  And San Francisco even purports to ban the distribution in San Francisco of fur products sold *outside* the city — whether in neighboring Oakland or faraway Oslo — thus further interfering with interstate and foreign commerce.

10.     While San Francisco is welcome to issue a resolution stating that its Board of Supervisors disapproves of the purchase of fur products — as it has done, for example, with eggs from caged hens — what it may *not* do under the Supreme Court's Dormant Commerce Clause jurisprudence is place a dam in the stream of interstate and foreign commerce of tens of millions of dollars of products that do not threaten the health, safety, or welfare of a single resident — human or animal — of San Francisco. When fur products made from animals raised in Europe, for example — under some of the strictest animal welfare conditions in the world — reach San Francisco's city limits, the Fur Ban's total prohibition on their sale and distribution is an insurmountable and therefore unconstitutional burden on foreign commerce.

11.     The Fur Ban took effect on January 1, 2019, but its enforcement provisions did not immediately apply to "persons or entities" engaged in the sale, offer for sale, display for sale, trade, gift, donation, or other distribution of fur products if the person or entity purchased or obtained the fur product or before March 20, 2018.  As of January 1, 2020, however, those enforcement provisions are in effect as to *all* fur products — regardless of when they were purchased or obtained.

12.     In this case, the International Fur Trade Federation seeks a judicial declaration and permanent injunction against the enforcement of the Fur Ban on the grounds that it is unconstitutional.  The Fur Ban violates the United States Supreme Court's Dormant Commerce Clause doctrine in multiple ways and must be enjoined.

- 4 -

**JURISDICTION**

13.     This case arises under the Constitution of the United States and under 42 U.S.C. § 1983, as further alleged below.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, as further alleged below.

**INTRADISTRICT ASSIGNMENT**

14.     Pursuant to Civil L.R. 3-5(b), 3-2(c), and 3-2(d), because this action arises in the County of San Francisco (among other places), in that a substantial part of the events which give rise to the claims are occurring in that county, this action "shall be assigned to the San Francisco Division or the Oakland Division."

**THE PARTIES**

15.     Plaintiff International Fur Trade Federation ("IFF") is an unincorporated association headquartered in the United Kingdom.  IFF, established in 1949, represents the international fur industry and regulates its practices and trade.  IFF promotes the business of fur by establishing certification and traceability programs on animal welfare and the environment.  IFF represents 56 members associations in over 40 countries around the world.  The members encompass all parts of the fur trade, including farmers, trappers, auction houses, brokers, dressers, designers, manufacturers, and retailers. IFF's members whose fur products have been sold in San Francisco face an immediate threat of liability and fines if they sell *any* of their fur products there today.  Any of IFF's current members whose fur products have been sold in San Francisco would have standing in their own right to present the claims asserted in this action, though neither the claims asserted nor the relief requested requires that these federation members participate individually in this suit.  IFF itself is also suffering injury as an association in the form of a continuing drain on its resources as long as the Fur Ban remains in effect and the association must devote its resources to trying to ascertain and educate its members as to the scope of the Fur Ban's application to them and to their customers.

16.     Defendant City and County of San Francisco ("San Francisco") is a local government in San Francisco, California.  San Francisco enacted the unconstitutional

- 5 -
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Fur Ban, employs the agents tasked with its enforcement, and, under section 1D.5(b)(4) of the Fur Ban, receives the fines that result from its enforcement.

17.     Defendant Dr. Grant Colfax is the Director of San Francisco's Department of Public Health.  Section 1D.5 of the Fur Ban provides for its enforcement through administrative citations and the imposition of fines by the Director, i.e., Defendant Colfax.  Defendant Colfax has published an "Animal Fur Products Frequently Asked Questions" page that indicates he and his Department intend to enforce the Fur Ban against the sale, offer for sale, or distribution of Fur Products in San Francisco.

## GENERAL ALLEGATIONS

### *Fur Products Sold in San Francisco Are in Interstate and Foreign Commerce*

18.     There can be no question that fur products sold in San Francisco are in interstate and foreign commerce.

19.     Because there are no fur farming or commercial trapping operations in San Francisco, all of the fur products that are sold in San Francisco come from outside the city.  In addition, because the largest fur-producing farms are all located outside California or outside the United States, it is impossible that none of the fur products that have been sold in San Francisco are from IFF members' farming operations in other states and countries.  Moreover, according to the California Department of Fish and Wildlife, the total number of trapped animals throughout the state in 2017 was only 1,568.  Thus, it is impossible that none of the fur products that have been sold in San Francisco are from IFF members' trapping operations in other states and countries.

20.     For example, outside of China, the world's leading producer of mink pelts is Denmark (with over 17 million produced in 2017), and Danish mink pelts are regularly sold at auctions in North America for use in fur products sold throughout the United States, including in San Francisco.  Outside of China, the world's leading producer of fox pelts is Finland (with over 2 million produced in 2017), and Finnish fox pelts are likewise regularly sold at auctions in North America for use in fur products sold throughout the United States, including in San Francisco.  Roughly 75% of fur

- 6 -

from chinchilla comes from outside the United States.  And all fur from Asiatic raccoons, all Russian sable, and all karakul comes from outside the United States.

21.    The federal Fur Products Labeling Act, 15 U.S.C. §§ 69 *et seq*., defines "commerce" to include commerce between any State "and any place outside thereof"; "or between points within the same State … but through any place outside thereof." Accordingly, Congress deems even sales within San Francisco or between San Francisco and other places within California to be in interstate or foreign commerce if the sales are made — as San Francisco goes so far as to prohibit for fur products — over the Internet through a retailer outside the city.

***San Francisco's Fur Ban Does More Than Substantially Burden Interstate and Foreign Commerce***

22.    According to a survey of retailers by the San Francisco Chamber of Commerce and the Union Square Business Improvement District, the loss caused by the Fur Ban for San Francisco retailers who carry fur clothing alone is estimated to be $45 million a year.  Even San Francisco's Controller acknowledged a loss, based on 2012 sales figures, on the same order of magnitude.

23.    According to data from the U.S. Census Bureau's 2012 Economic Census, the category of "Furs and Fur Garments" alone showed $355 million in California sales in 2012 (the most recent year with product category data).  San Francisco's Controller recognized that San Francisco likely "accounts for a disproportionate share" of fur products.  Even assuming San Francisco's share of fur sales is only proportionate to its share of all retail sales in California (which is a conservative assumption given San Francisco's colder temperatures than the state's other major population centers and its prominence as a shopping destination), San Francisco's Controller estimated — based on data from a census published seven years ago — that its sales of fur were close to $11 million in 2012.

24.    The Fur Ban does not just "burden" or "substantially burden" interstate and foreign commerce in fur products.  For fur products made of animals other than cows,

- 7 -

lambs, or sheep, the Fur Ban places a complete ban on the "sale, offer for sale, display for sale, trade, gift, donation, or other distribution" of them.  S.F. Health Code § 1D.4(a).  There can be no greater burden on such commerce in a particular market than to altogether prohibit it.

25.    While San Francisco's Office of the Controller wrote in March 2018 that the Fur Ban did not explicitly prohibit "out-of-town or online sales," Defendant Colfax today takes the position that retailers who are not even located in San Francisco violate the Fur Ban if a customer uses the Internet to have a fur product sold elsewhere in the world shipped to him or her in San Francisco.  *See* https://www.sfdph.org/dph/EH/AnimalFur/faq.asp.  And he further takes the position that the mere distribution of a fur product through San Francisco "by any means" violates the Fur Ban, such that fur products may not even be transported through the city, whether through the Port of San Francisco or even on a UPS truck.  *Id*.

26.    For San Francisco to completely ban the sale of fur products (as defined in the Fur Ban) — all of which come from outside San Francisco and virtually all of which come from outside California, with a large percentage originating outside the United States — is for San Francisco to more than substantially burden interstate and foreign commerce.

*San Francisco's Fur Ban Has No Legitimate Local Purpose*

27.    While San Francisco's interest in the welfare of animals within its own jurisdiction is a proper — and laudable — legislative interest, the Fur Ban does not even articulate, let alone advance, any legitimate *local* purpose as applied to fur products from animals raised or trapped entirely in other states and countries.

28.    The Fur Ban recites that "[t]he sale of fur products in San Francisco is inconsistent with the City's ethos of treating all living beings, humans and animals alike, with kindness.  In light of the wide array of faux fur and other alternatives for fashion and apparel, the demand for fur products does not justify the unnecessary killing and cruel treatment of animals.  Eliminating the sale of fur products in San

Francisco will promote community awareness of animal welfare, bolster the City's stance against animal cruelty, and, in turn, foster a more humane environment in San Francisco." S.F. Health Code § 1D.2(i).

29.    But none of these statements articulates a legitimate local purpose for legislation — and certainly not for a total ban on products that do not constitute any threat to the health, safety, or welfare of any person *or animal* within San Francisco. If they did, then *any* city or state could ban *any* product on the ground that its sale is "inconsistent with the City's ethos of treating all living beings, human and animals alike, with kindness." But virtually all products derived from animals involve either the death or at least some discomfort of the animals. Even products that result from human labor may involve a certain rate of death or at least some discomfort among the human beings who produce them. It cannot be the case that a city or state may impose a complete ban on a product merely because it deems the treatment of animals or people — particularly animals or people in *other* jurisdictions — as not kind enough.

30.    In any event, San Francisco does not even have any consistent (let alone rational) ethos of treating all livings beings, "humans and animals alike," with kindness. For example, this year San Francisco reported more than 8,000 homeless humans within its county, and San Francisco's "shelters" have put to death even more than that number of dogs, cats, and other animals within the last six years alone. San Francisco's "ethos" for purposes of justifying the most burdensome of burdens on interstate and foreign commerce cannot be whatever its Board of Supervisors claims it is.

31.    Similarly, because there are almost always alternatives to every animal product (albeit highly inferior alternatives in many cases), a claim that the killing of animals is "unnecessary" — again, as to animals outside San Francisco — cannot be a valid basis for a burden on commerce. And "promot[ing] community awareness of animal welfare, bolster[ing] the City's stance against animal cruelty, and, in turn, foster[ing] a more humane environment in San Francisco" are neither intelligible legislative interests nor (to the extent their meaning can be divined) even advanced in

- 9 -

any way by the Fur Ban.  For example, the absence of new fur products in retail stores in San Francisco does not "promote community awareness of animal welfare"; rather, it projects no message about it at all.  Similarly, other than the virtue-signaling aspect of the recitals in the Fur Ban itself, the absence of new fur products in retail stores in San Francisco does absolutely nothing to "bolster the City's stance against animal cruelty." If actual cruelty to animals is taking place in San Francisco or anywhere else in the world, the unavailability of new fur products within the city does nothing to stop it. And unless fostering a "more humane environment in San Francisco" means whatever San Francisco wants it to mean, prohibiting the sale of new fur products in the city while allowing those same products to be worn in public and displayed in the windows of second-hand stores has no effect on how "humane" the environment is.

32.    None of the Fur Ban's other "findings" — all of which pertain to fur farming that does not even take place anywhere in San Francisco — constitutes a legitimate local purpose for banning the sale of fur products in the city.  Indeed, that the Fur Ban reflects San Francisco's attempt to condemn even the world's most responsible fur farmers and trappers simply because they raise animals for their fur — again, animals that are raised entirely outside San Francisco — is reflected by its author's statement that "I just think it's completely inhumane knowing that there are people who farm animals particularly to use their fur or skin for fashion apparel."  Rachel Swan, *Supervisor Katy Tang wants fur banned in SF*, S.F. Chronicle (Jan. 23, 2018), available at https://www.sfchronicle.com/ politics/article/Supervisor-Katy-Tang-wants-fur-banned-in-SF-12519739.php.

33.    No court has ever held that a belief that the farming animals of animals in *other states and countries* is inhumane constitutes a legitimate *local* purpose for banning the resulting products.

## FIRST CAUSE OF ACTION

### Declaratory Relief — Unenforceability of Fur Ban Against Fur Products Shipped from Outside San Francisco to Persons in San Francisco

34.     IFF realleges and incorporates by reference all of the preceding paragraphs.

35.     There exists a dispute between the parties regarding the enforceability of the Fur Ban against fur products that are shipped from locations outside San Francisco to persons in San Francisco.

36.     As alleged above, the Fur Ban makes it unlawful not only to sell a fur product within San Francisco but also to "offer for sale, display for sale, trade, give, donate, or otherwise distribute a Fur Product by any means in San Francisco."  S.F. Health Code § 1D.4(a).

37.     Based on a plain reading of this section of the Fur Ban, the term "otherwise distribute a Fur Product by any means" in San Francisco must be read as limited to distribution in San Francisco of a fur product that has been sold *in San Francisco*.  In other words, the Fur Ban's geographically limiting language "in San Francisco" must be read as limiting sales, offers for sale, displays for sale, trades, gifts, and donations only if they take place entirely in San Francisco.  Accordingly, the term "otherwise distribute a Fur Product by any means in San Francisco" must be read to apply to other forms of distributing fur products where the distribution results from sales (and, e.g., trades, gifts, and donations) that take place entirely *in San Francisco*.

38.     Under section 1D.5(a) of the Fur Ban, Defendant Colfax is authorized to "issue rules, regulations, and guidelines necessary or appropriate for the implementation and enforcement of" the Fur Ban.  On information and belief, Defendant Colfax has not issued any rules or regulations concerning the Fur Ban.

39.     In an online FAQ intended to provide guidelines for its enforcement, Defendant Colfax has, however, interpreted the Fur Ban as applying to sellers who are not even located in San Francisco if a customer uses the Internet (or other means of communication, such as a telephone) to have a fur product sold elsewhere in the world shipped to him or her — or even to a gift recipient — in San Francisco.  Answering the question, "Would a retailer that is not physically located in the City violate the

- 11 -

Ordinance if a customer purchases a fur product through the retailer's website and the fur product is physically distributed to the City?" Defendant Colfax stated: "Yes. Article 1D section 1D.4(a) prohibits the distribution of a fur product by any means in the City. A retailer that sells a fur product and arranges for a fur product to be distributed to or from the City, violates section 1D.4(a) for distributing a fur product in the City." *See* https://www.sfdph.org/dph/EH/AnimalFur/faq.asp. Defendant Colfax apparently takes the position that the mere distribution of a fur product in San Francisco "by any means" violates the Fur Ban, such that fur products sold by a retailer *outside* San Francisco may not even be transported to a recipient in the city, whether through the Port of San Francisco or even on a UPS truck. *Id.*

40.     Yet it would be an even greater and more far-reaching burden on interstate and foreign commerce to enforce the Fur Ban against the sale of products that are sold *outside* San Francisco merely because they are subsequently distributed in San Francisco to a purchaser or other recipient.

41.     Even other San Francisco officials have not read the Fur Ban in such a way as Defendant Colfax has. As alleged above, in assessing the "Potential Impacts of a Fur Ban," San Francisco's Controller wrote in March 2018 that the possession of fur products "is not banned; nor are *out-of-town* or *online* sales prohibited."

42.     As alleged above, IFF members now face prosecution by Defendants when their products are shipped to persons in San Francisco, even after title has passed from a seller outside San Francisco, despite the fact that, under California's own version of the Uniform Commercial Code, title passes, and therefore as a matter of law the sale of these products takes place, outside San Francisco. Cal. Comm. Code §§ 2106(1), 2401(2)(1).

43.     As alleged herein, an actual controversy has arisen and now exists regarding a matter over which this Court has subject-matter jurisdiction — the constitutionality of the Fur Ban — which depends on the scope of its application, including whether the Fur Ban is enforceable against out-of-state sales of IFF's

members' fur products that are shipped to persons in San Francisco after title has passed from a seller outside San Francisco — or outside the State of California.

44.    A declaratory judgment as to the enforceability of the Fur Ban against such out-of-state sales will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this cause of action.  Plaintiffs therefore seek declaratory and further relief under 28 U.S.C. §§ 2201 et seq. (the Declaratory Judgment Act).

45.    The threat of enforcement of the Fur Ban is causing immediate and irreparable injury to IFF's members, including but not limited to lost sales, lost profits, loss of business opportunities, diminution in value of their business, and the threat of administrative fines, and will continue to cause irreparable harm unless enjoined.

46.    Because enforcement of the Fur Ban is causing harm that cannot be adequately compensated by the recovery of damages against Defendants, IFF requests that this Court provide preliminary and permanent injunctive relief enjoining Defendants from enforcing the Fur Ban against out-of-state sales of the IFF members' fur products that are shipped to persons in San Francisco after title has passed from a seller outside San Francisco or the State of California.

## SECOND CAUSE OF ACTION

**Violation of the Commerce Clause of the Constitution of the United States —**
**Substantial Burden on Interstate and Foreign Commerce**
**Without a "Legitimate Local Purpose"**

47.    IFF realleges and incorporates by reference all of the preceding paragraphs.

48.    The Commerce Clause of the United States Constitution empowers Congress "to regulate commerce with foreign nations, and among the several states[.]" U.S. Const. Art. 1, § 8, cl. 3.  Implicit from this express grant of power to Congress is a limitation on states' and cities' authority to enact laws that burden interstate and foreign commerce, which limitation is known as the Dormant Commerce Clause doctrine.

49.     Under the Supreme Court's (and Ninth Circuit's) test for whether a state or local statute that impacts interstate commerce violates the Dormant Commerce Clause doctrine:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *If a legitimate local purpose is found*, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*See, e.g., Yakima Valley Memorial Hosp. v. Washington State Dep't of Health*, 731 F.3d 843, 846 (9th Cir. 2013) (emphasis added), citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). This test is sometimes referred as *Pike* balancing.

50.     Here, as alleged above, San Francisco's Fur Ban imposes a substantial burden on interstate and foreign commerce. Indeed, there can be no more substantial a burden on commerce than a total ban on it, which is what the Fur Ban places on fur products that are sold, offered for sale, or so much as distributed in San Francisco.

51.     As a definitional matter, a state or local statute can only have a legitimate local purpose that outweighs its burden on commerce "[i]f a legitimate local purpose is found" in the first place. *Id*.

52.     Here, as alleged above, the Fur Ban does not advance any legitimate local purpose. While preventing what a local government may perceive as cruelty to animals has been recognized as a legitimate government interest, that purpose is — by definition — not "local" when it comes to the welfare of animals in other cities, states, and countries. And it is not even legitimate where the concerned voters and officials of those other jurisdictions have determined that there is no animal cruelty involved.

53.     Improving the welfare of fur animals in Wisconsin or Denmark, for example, is certainly a legitimate local purpose of the people and their governments *in*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Wisconsin or Denmark.* But it is not one as to which San Francisco — which does not even have any fur farming or commercial trapping operations within its own jurisdiction — can legislate. Just as San Francisco would recognize that neither Madison nor Copenhagen has any legitimate local purpose in legislating for the perceived welfare of the sea lions at Fisherman's Wharf, neither does San Francisco have any legitimate local purpose in legislating for the perceived welfare of animals in Wisconsin or Denmark — or any other place outside San Francisco.

54. Moreover, as alleged above, none of the statements in the Fur Ban's "Findings and Purpose" (section 1D.2) constitutes a legitimate local purpose. And phony virtue-signaling cannot constitute a legitimate local purpose or else any legislative body could ban *any* product under such a guise.

55. Thus, because the Fur Ban substantially burdens interstate and foreign commerce in fur products — including fur products sold by IFF's members — without a legitimate local purpose, it violates the Dormant Commerce Clause doctrine.

56. Accordingly, IFF is entitled to declaratory and injunctive relief against Defendants' enforcement of the Fur Ban.

## THIRD CAUSE OF ACTION

**Violation of the Commerce Clause of the Constitution of the United States —**

**Substantial Burden on Interstate Commerce**

**that Clearly Exceeds Any "Putative Local Benefits"**

57. IFF realleges and incorporates by reference all of the preceding paragraphs.

58. Under the *Pike* balancing test alleged above, even where a statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will not be upheld if the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

59. Here, as alleged above, San Francisco's Fur Ban imposes a substantial burden on interstate commerce. Indeed, there can be no more substantial a burden on

- 15 -

1  commerce than a total ban on it, which is what the Fur Ban places on fur products that

2  are sold, offered for sale, or so much as distributed in San Francisco.

3      60.    Moreover, as alleged above, apart from virtue-signaling, the Fur Ban does

4  not achieve any "putative local benefits."  San Francisco's claim that "[e]liminating the

5  sale of fur products in San Francisco will promote community awareness of animal

6  welfare, bolster the City's stance against animal cruelty, and, in turn, foster a more

7  humane environment in San Francisco" amounts to little more than happy talk.  For

8  example, the inability of consumers to purchase new fur products in San Francisco does

9  nothing to make the "community aware of animal welfare" since it says nothing about it

10  whatsoever.  And — unless they were to first read the Health Code — residents and

11  visitors will have no idea, as they look around the city, that San Francisco has somehow

12  "bolstered its stance against animal cruelty," especially since anyone can appear in

13  public wearing either real fur products (purchased in San Francisco before the Fur Ban

14  or anywhere outside San Francisco since then) or faux fur products.

15      61.    Thus, because the Fur Ban's burden on interstate commerce in fur products

16  — including fur products sold by IFF's members — is clearly excessive in relation to

17  its putative local benefits, it violates the Dormant Commerce Clause doctrine.

18      62.    In any event, even if the Fur Ban conferred any putative local benefits,

19  whether as an exercise in virtue-signaling or otherwise, the San Francisco Board of

20  Supervisors' interest in expressing its dislike of fur products could be promoted just as

21  well — or even better — with a far lesser impact on interstate commerce than a total

22  ban.  Such alternatives include but are not limited to passing a resolution expressing

23  whatever feelings the Board of Supervisors has about fur, as it has done in the past with

24  resolutions "[u]rging San Franciscans not to purchase eggs produced by caged hens and

25  opposing the factory farming practice of confining egg-laying hens in battery cages."

26  *See, e.g.*, S.F. Resolution No. 20-08.  Or San Francisco could offer public education

27  about fur products that would reflect its dislike of them.  Or San Francisco could even

28  require sellers of fur products to make certain disclosures as to whether their products

- 16 -

have obtained certification from WelFur or FurMark or any other indicator of their compliance with animal welfare standards.  Indeed, any of these or other alternatives would by definition have a lesser impact on interstate commerce than a total ban.

63.     Accordingly, IFF is entitled to declaratory and injunctive relief against Defendants' enforcement of the Fur Ban.

## FOURTH CAUSE OF ACTION

### Violation of the Commerce Clause of the Constitution of the United States — Substantial Burden on Foreign Commerce that Clearly Exceeds Any "Putative Local Benefits"

64.     IFF realleges and incorporates by reference all of the preceding paragraphs.

65.     Under the *Pike* balancing test alleged above, even where a statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on foreign commerce are only incidental, it will not be upheld if the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

66.     Here, as alleged above, San Francisco's Fur Ban imposes a substantial burden on foreign commerce.  Indeed, there can be no more substantial a burden on commerce than a total ban on it, which is what the Fur Ban places on fur products that are sold, offered for sale, or so much as distributed in San Francisco, even if those products come from outside the United States.

67.     Moreover, as alleged above, apart from virtue-signaling, the Fur Ban does not achieve any "putative local benefits."  San Francisco's claim that "[e]liminating the sale of fur products in San Francisco will promote community awareness of animal welfare, bolster the City's stance against animal cruelty, and, in turn, foster a more humane environment in San Francisco" amounts to little more than happy talk.  For example, the inability of consumers to purchase new fur products in San Francisco does nothing to make the "community aware of animal welfare" since it says nothing about it whatsoever.  And — unless they were to first read the Health Code — residents and

- 17 -

visitors will have no idea, as they look around the city, that San Francisco has somehow "bolstered its stance against animal cruelty," especially since anyone can appear in public wearing either real fur products (purchased in San Francisco before the Fur Ban or anywhere outside San Francisco since then) or faux fur products.

68.    Thus, because the Fur Ban's burden on foreign commerce in fur products — including fur products sold by IFF's members — is clearly excessive in relation to its putative local benefits, it violates the Dormant Commerce Clause doctrine.

69.    In any event, even if the Fur Ban conferred any putative local benefits, whether as an exercise in virtue-signaling or otherwise, the San Francisco Board of Supervisors' interest in expressing its dislike of fur products could be promoted just as well — or even better — with a far lesser impact on foreign commerce than a total ban. Such alternatives include but are not limited to passing a resolution expressing whatever feelings the Board of Supervisors has about fur, as it has done in the past with resolutions "[u]rging San Franciscans not to purchase eggs produced by caged hens and opposing the factory farming practice of confining egg-laying hens in battery cages." *See, e.g.*, S.F. Resolution No. 20-08.  Or San Francisco could offer public education about fur products that would reflect its dislike of them.  Or San Francisco could even require sellers of fur products to make certain disclosures as to whether their products have obtained certification from WelFur or FurMark or any other indicator of their compliance with animal welfare standards.  Indeed, any of these or other alternatives would by definition have a lesser impact on foreign commerce than a total ban.

70.    Accordingly, IFF is entitled to declaratory and injunctive relief against Defendants' enforcement of the Fur Ban.

### PRAYER FOR RELIEF

WHEREFORE, IFF respectfully seeks the following relief from this Court:

A.    A declaratory judgment, pursuant to 28 U.S.C. §§ 2201 *et seq*. (the Declaratory Judgment Act), that the Fur Ban, i.e., Article 1D of the San Francisco

Health Code, violates the Commerce Clause as an unconstitutional burden on interstate and foreign commerce that clearly exceeds any putative local benefits;

B.      A permanent injunction prohibiting Defendants from enforcing the Fur Ban, i.e., Article 1D of the San Francisco Health Code, against the sale of any of IFF's members' fur products;

C.      An award of reasonable attorney's fees and costs to extent permitted by law, including but not limited to under 42 U.S.C. § 1988; and

D.      Such other relief as the Court deems just and proper.

Respectfully submitted,

Dated:  January 13, 2020            /s/ Michael Tenenbaum

Michael Tenenbaum, Esq.
*mt@post.harvard.edu*
THE OFFICE OF MICHAEL TENENBAUM, ESQ.

*Counsel for Plaintiff International Fur Trade Federation*

# DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

Dated:  January 13, 2020

/s/ Michael Tenenbaum

Michael Tenenbaum, Esq.
*mt@post.harvard.edu*
THE OFFICE OF MICHAEL TENENBAUM, ESQ.

*Counsel for Plaintiff International Fur Trade Federation*