Michael Tenenbaum, Esq. (No. 186850)
*mt@post.harvard.edu*
THE OFFICE OF MICHAEL TENENBAUM, ESQ.
1431 Ocean Ave., Ste. 400
Santa Monica, CA  90401
Tel      (424) 246-8685
Fax      (424) 203-4285

*Counsel for Plaintiff International Fur Trade Federation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL FUR TRADE FEDERATION, an unincorporated association;<br><br>Plaintiff,<br><br>– against –<br><br>CITY AND COUNTY OF SAN FRANCISCO; and<br><br>DR. GRANT COLFAX, an individual, in his official capacity as Director of the San Francisco Department of Public Health;<br><br>Defendants. | Case No. 3:20-cv-00242-RS<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:           July 2, 2020<br>Time:          1:30 p.m.<br>Courtroom:  3<br><br>Hon. Richard Seeborg<br><br>ORAL ARGUMENT REQUESTED |

**NOTICE OF MOTION AND MOTION**

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on July 2, 2020, at 1:30 p.m., or as soon thereafter as counsel may be heard before the Honorable Richard Seeborg in Courtroom 3 of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff International Fur Trade Federation ("IFF") will and hereby does move this Court under Rule 56 of the Federal Rules of Civil Procedure for an order granting summary judgment against Defendants City and County of San Francisco (the "City") and Dr. Grant Colfax (in his official capacity as Director of the City's Department of Public Health) on IFF's First through Fourth Causes of Action challenging San Francisco's Animal Fur Products Ordinance, codified in S.F. Health Code § 1D *et seq.* (the "Fur Ban").

As to IFF's First Cause of Action for Declaratory Relief under 22 U.S.C. §§ 2201 *et seq.*, this motion is and will be made on the principal grounds that:  (1) there is an actual controversy between the parties based on Defendants' threat of enforcement of the Fur Ban against online and other of out-of-town sales of Fur Products where a product is shipped to a recipient in the City; (2) based on the text and legislative history of the Fur Ban, the term "sell … or otherwise distribute a Fur Product by any means in San Francisco" must be read as limited to distribution in the City of a fur product to be *sold in San Francisco*, such that the Fur Ban does not apply to sellers of Fur Products who are not even located in the City if a customer uses the Internet (or telephone) to have a Fur Product sold elsewhere in the world shipped to him or her — or even to a gift recipient — in the City; and (3) declaratory relief is necessary to establish that the Fur Ban does not apply to such online and out-of-town sales because Defendant Colfax has, until even after IFF filed this lawsuit, threatened to prosecute such sales, and Defendant Colfax refuses to definitively abandon this interpretation as part of his enforcement policy.

As to IFF's Second Cause of Action alleging a violation of the Commerce Clause of the Constitution of the United States, this motion is and will be made on the principal grounds that the Fur Ban does not advance any "legitimate local purpose" — i.e., any non-illusory purpose *in San Francisco* — as required to withstand constitutional scrutiny under *Pike v. Bruce Church, Inc.*, 397

U.S. 137, 142 (1970).  None of the statements in the Fur Ban's "Findings and Purpose" (section 1D.2) constitutes a legitimate local purpose as applied to fur products produced by IFF's members (or its members' members) outside the City.  The Fur Ban does nothing to address alleged "animal cruelty" or environmental harm *in San Francisco*, which does not even have any fur farming or commercial trapping operations within its own jurisdiction.  Instead, the Fur Ban purports to protect animals and the environment in *other* states and countries — a purpose that is, by definition, not "local," and is not even "legitimate" where the voters and public officials of those other jurisdictions have determined that there is no unnecessary harm to their respective animals or environment.

As to IFF's Third and Fourth Causes of Action alleging violations of the Commerce Clause of the Constitution of the United States, this motion is and will be made on the principal grounds that the Fur Ban imposes a substantial burden on interstate (Third Cause of Action) and foreign (Fourth Cause of Action) commerce that clearly exceeds any putative local benefits.  Indeed, there can be no more substantial a burden on commerce than a complete market ban on it, which is what the Fur Ban places on fur products that are sold or so much as distributed in San Francisco — the value of which was, as the City recognized at the time of its enactment, in the tens of millions of dollars per year.

IFF's motion is and will be based upon the following Memorandum of Points and Authorities; upon the accompanying Declarations of Mark Oaten, Paul Stockall, Dr. Barbara Sixt, Dr. Hugh Hildebrandt, Michael Whelan, Charles Ross, Johannes Monakas, Benjamin Lin, Nick Pologeorgis, Maria Reich, Leonard Gorski, Alan Herscovici, Robert Zimbal, and Michael Tenenbaum; upon the pleadings and papers on file in this action; and upon such other evidence or argument as may be presented to the Court in connection with the hearing on the motion.

Respectfully submitted,

Dated:  May 21, 2020

/s/ Michael Tenenbaum

Michael Tenenbaum, Esq.
*mt@post.harvard.edu*
THE OFFICE OF MICHAEL TENENBAUM, ESQ.

*Counsel for Plaintiff International Fur Trade Federation*

# TABLE OF CONTENTS

STATEMENT OF ISSUES TO BE DECIDED ..................................................................vi

INTRODUCTION AND SUMMARY OF MOTION ........................................................1

THE RELEVANT UNDISPUTABLE FACTS ................................................................2

I.    With Arbitrary Exceptions, San Francisco Bans All Commerce in "Fur Products"................2

    A.    San Francisco Categorically Bans the Sale and Distribution of All Fur
        Products..................................................................................................2

    B.    San Francisco Further Threatens to Apply Its Ban Even to Retailers of
        Fur Products Located *Outside* San Francisco .................................................3

        1.    The Fur Ban Is Enacted with the Understanding That It Does Not
            Prohibit Out-of-Town or Online Sales.............................................3

        2.    Defendant Colfax Threatens to Enforce the Fur Ban Against
            Retailers Outside San Francisco ....................................................4

        3.    In Response to This Lawsuit, Defendant Colfax Now Says He Is
            Not Enforcing the Fur Ban against Retailers Outside the City —
            But That He May "Decide in the Future to Pursue Enforcement"..................5

II.   The Fur Ban Imposes a Complete Embargo on Tens of Millions of Dollars of
    Fur Products from Other States and Countries ..........................................................6

III.  No Animals Are Farmed or Trapped for Their Fur in San Francisco.............................8

ARGUMENT ...................................................................................................9

I.    IFF Is Entitled to Summary Judgment on Its First Cause of Action for a
    Declaratory Judgment That the Fur Ban Does Not Apply to Sales by Retailers
    Outside San Francisco......................................................................................9

    A.    IFF Satisfies the Legal Standard for Declaratory Relief.........................................9

    B.    The Fur Ban Applies Only to a Fur Product Sold or "Otherwise
        Distribute[d]" *in* San Francisco — Not to Products Sold by a Retailer
        Outside the City ..................................................................................11

II.   IFF is Entitled to Summary Judgment on Its Causes of Action Alleging That the
    Fur Ban Violates the Dormant Commerce Clause Because the Fur Ban Imposes a
    Substantial Burden on Interstate and Foreign Commerce that Clearly Exceeds
    Any "Putative Local Benefits"..........................................................................13

A.   The Legal Standard Established in *Pike v. Bruce Church, Inc.*, Requires This Court to Determine Whether the Fur Ban Substantially Burdens Interstate or Foreign Commerce and to Ascertain Whether the Fur Ban Serves a "Legitimate Local Purpose" ........................................................... 14

B.   The Fur Ban Does Far More Than "Substantially" Burden Interstate and Foreign Commerce in Fur Products ................................................... 15

C.   The Purposes Set Forth in the Fur Ban Are Neither "Local" Nor "Legitimate" ................................................................................................... 17

    1.   The Putative Purpose Referring to Animal Welfare Is Certainly Not "Local" ................................................................................................... 18

        a.   The Putative Purpose Referring to Animal Welfare Is Also Not Even Legitimate as to Fur from IFF's Members ................................................................................................... 19

    2.   The Putative Purposes Referring to the Environment, Energy Consumption, and Chemicals Are Certainly Not "Local" ........................... 21

        a.   The Putative Purposes Referring to the Environment, Energy Consumption, and Chemicals Are Also Illusory, Irrational, and Pretextual as to Fur from IFF's Members .................. 21

D.   The Fur Ban's Complete Ban on All Interstate and Foreign Commerce in Fur Products Clearly Exceeds Any Putative Local Benefits ................................. 22

E.   Any Legitimate Interest Sought to Be Effectuated Locally by the Fur Ban Could Be Promoted by Multiple Alternative Means with Far Lesser Impacts on Commerce ........................................................................... 23

CONCLUSION ........................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Ass'n des Eleveurs de Canards et D'Oies du Quebec v. Harris*,
4
    79 F. Supp. 3d 1136 (C.D. Cal. 2015) ........................... 11

5

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
6
    729 F.3d 937 (9th Cir. 2013)........................................ 16

7
*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
    870 F.3d 1140 (9th Cir. 2017)...................................... 11

8

*Babbitt v. United Farm Workers National Union*,
9
    442 U.S. 289 (1979).................................................... 11

10

*Crosby v. Nat'l Foreign Trade Council*,
11
    530 U.S. 363 (2000).................................................... 19

12

*CTS Corp. v. Dynamics Corp. of America*,
    481 U.S. 69 (1987)...................................................... 19

13

*Edgar v. MITE Corp.*,
14
    457 U.S. 624 (1982).................................................... 18

15

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
16
    485 U.S. 568 (1988).................................................... 13

17

*Great Atl. & Pac. Tea Co.*,
    424 U.S. 366 (1976) ............................................... 1, 14

18

*H. P. Hood & Sons, Inc. v. Du Mond*,
19
    336 U.S. 525 (1949).................................................... 22

20

*Hughes v. Alexandria Scrap Corp.*,
21
    426 U.S. 794 (1976).................................................... 23

22

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977).................................................... 23

23

*Kassel v. Consol. Freightways Corp. of Del.*,
24
    450 U.S. 662 (1981).................................................... 21

25

*MedImmune, Inc. v. Genentech, Inc.*,
26
    549 U.S. 118 (2007).................................................... 10

27

*Montana Shooting Sports Ass'n v. Holder*,
28
    727 F.3d 975 (9th Cir. 2013)........................................ 11

*Nat'l Audubon Soc'y, Inc. v. Davis*,
    307 F.3d 835 (9th Cir. 2002)..............................................................................10

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
    682 F.3d 1144 (9th Cir. 2012).......................................................................15, 23

*Nat'l Foreign Trade Council v. Natsios*,
    181 F.3d 38 (1st Cir. 1999) ...............................................................................19

*People v. Garcia*,
    2 Cal.5th 792 (2017) ..........................................................................................13

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)....................................................................................*passim*

*Poe v. Ullman*,
    367 U.S. 497 (1961) ...........................................................................................11

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070, (9th Cir. 2013) .....................................................................16, 18

*Rocky Mountain Farmers Union v. Corey*,
    913 F.3d 940 (9th Cir. 2019) .............................................................................18

*Sam Francis Foundation v. Christies, Inc.*,
    784 F.3d 1320 (9th Cir. 2015) ........................................................................1, 15

*South Dakota v. Wayfair*,
    138 S. Ct. 2080 (2018)........................................................................................23

*Sullivan v. Oracle Corp.*,
    51 Cal.4th 1191 (2011) .......................................................................................13

*Yakima Valley Memorial Hosp. v. Washington State Dep't of Health*,
    731 F.3d 843 (9th Cir. 2013) ........................................................................15, 17

**Statutes, Regulations, and Rules**

15 U.S.C. § 69 .............................................................................................................19

15 U.S.C. § 69b ...........................................................................................................19

28 U.S.C. § 2201 .......................................................................................................1, 10

16 C.F.R. §§ 301.0 *et seq* ........................................................................................*19*

Fed. R. Civ. P. 56 ................................................................................................... 9

Fed. R. Civ. P. 57 ................................................................................................. 10

Cal. Fish & Game Code § 4000 .............................................................................. 3

Cal. Fish & Game Code § 4001 ......................................................................... 3, 8

Cal. Fish & Game Code § 4150 .............................................................................. 3

Cal. Health & Safety Code § 108042 .................................................................. 12

S.F. Environmental Code §§ 2301 *et seq.* ......................................................... 24

S.F. Environmental Code §§ 2701 *et seq.* ......................................................... 24

S.F. Heath Code § 1C.3 ....................................................................................... 21

S.F. Health Code §§ 1D *et seq.* ................................................................... *passim*

S.F. Park Code § 5.08 .......................................................................................... 20

S.F. Police Code § 488 ......................................................................................... 20

S.F. Port Code § 4.7 ............................................................................................. 20

**Other Authorities**

S.F. Resolution No. 20-08 .................................................................................... 24

**Constitutional Provisions**

U.S. Const. Art. 1, § 8, cl. 3 ............................................................................... 14

## STATEMENT OF THE ISSUES TO BE DECIDED

1.      Whether San Francisco's ban on fur products — which makes it unlawful "to sell … or otherwise distribute a Fur Product by any means in San Francisco" (the "City") — applies to a retailer with no physical presence in the City who engages in the sale of Fur Products outside the City, including through a website, but ships a Fur Product to a recipient in the City?

2.      Whether the City's complete market ban on all commerce in fur products from other States and countries imposes a substantial burden on interstate or foreign commerce under the Supreme Court's balancing test in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)?

3.      Whether the City's ban on fur products effectuates "a legitimate local purpose" — even if no animals are farmed or trapped for their fur in San Francisco?

4.      Whether the burden on interstate and foreign commerce imposed by the City's ban is "clearly excessive" in relation to its putative local benefits?

5.      Whether any legitimate local interest could be promoted as well with a  lesser impact on interstate activities than that imposed by the City's complete market ban?

1

### INTRODUCTION AND SUMMARY OF MOTION

2   This case is about San Francisco's ban on fur products, a subject that, as the sponsor of the ban

3   said as she introduced it, "can arouse a lot of emotion." (*See* video of S.F. Public Safety and

4   Neighborhood Services Cmte. Mtg., Jan. 24, 2018, available at http://sanfrancisco.granicus.com/

5   MediaPlayer.php?view_id=10&clip_id=29635&meta_id=595744.)  After claiming that "we don't

6   know how the animals are actually treated, what kind of conditions they're living in," the author

7   explained her motivation for the ban:  "I just don't believe that we should be profiting on the backs of

8   animals, I mean literally." (*See id.*)  Without a word of debate, San Francisco's Board of Supervisors

9   went on to vote, unanimously, to ban the sale of virtually all fur products.  S.F. Health Code Art. 1D

10  (the "Fur Ban").  (*See* video of S.F. Board of Supervisors Mtg., Mar. 20, 2018, available at

11  http://sanfrancisco.granicus.com/MediaPlayer.php? view_id=10&clip_id=30068&meta_id=604791.)

12  While San Francisco's Board of Supervisors may now share the worldview of animal rights

13  groups like PETA (or like Intervenor-Defendants), IFF is not challenging the Fur Ban in this Court

14  based on a mere policy disagreement.  San Francisco remains part of the United States and thus remains

15  subject to the Constitution.  This includes the well-established dormant Commerce Clause "principle

16  [which] ensures that state autonomy over 'local needs' does not inhibit 'the overriding requirement of

17  freedom for the national commerce.'"  *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320, 1323

18  (9th Cir. 2015) (en banc), quoting *Great Atl. & Pac. Tea Co.*, 424 U.S. 366, 371 (1976).

19  Under the Supreme Court's test for determining whether even a facially neutral law violates

20  the Commerce Clause, this Court must invalidate the Fur Ban because the substantial burden it

21  imposes on interstate and foreign commerce — a complete closure of San Francisco's market to the

22  tens of millions of dollars of fur products from other States and countries that (until January) were sold

23  each year in San Francisco — is clearly excessive in relation to its putative benefits, which are illusory

24  and, most fundamentally, ***not local***.  Indeed, it is undisputed in this case that there are ***no animals***

25  ***farmed or trapped for their fur in San Francisco***.  Put simply, the Fur Ban places a dam in the stream

26  of interstate and foreign commerce in products that do not threaten the health, safety, or welfare of a

27  single resident — human or animal — of San Francisco.  This case is thus appropriate for summary

28  judgment in IFF's favor.

- 1 -

If the Court were to hold that a city can constitutionally ban all commerce from as entire industry (here, fur) based on a purported interest in the welfare of animals in other states and countries, then wouldn't the Court have to similarly believe that a city (or state) could constitutionally ban the sale of all commerce from *any* industry simply by professing an interest in the welfare of animals — or even of people — outside its jurisdiction, in spite of the resulting burden on the free flow of goods? This case may involve San Francisco's ban on fur products, but it does not take much to imagine the chaos that would result if every other city or state applied the doctrine of "what's-good-for-goose-is-good-for-the-gander" to close their markets to products or services based on practices they may disapprove of well beyond the borders of their police power.

But, first, this case asks the Court to provide declaratory relief regarding the geographic scope of the Fur Ban in light of the controversy between the parties over its application to online and out-of-town sales by retailers physically located ***outside San Francisco***.  IFF contends that the Fur Ban must be construed as limited to the sale and distribution of Fur Products as part of a sale that takes place ***in San Francisco*** — and thus as inapplicable to retailers outside San Francisco.  Defendants have flip-flopped on this issue.  They first publicly declared that they will prosecute retailers not physically located in San Francisco if they sell a Fur Product outside San Francisco and arrange for it to be shipped it to San Francisco.  Now, in response to this lawsuit, Defendants claim that they are not currently enforcing the Fur Ban against retailers with no physical presence in the City.  But, tellingly, Defendants will not stipulate not to resume such enforcement.  Meanwhile, IFF's members (and its members' members) are losing sales as a result of this uncertainty and require a declaratory judgment from this Court to clarify the Fur Ban's limits on their rights.  Ascertaining the geographic scope of the Fur Ban is also necessary for the Court's determination of the burden it places on commerce.

## THE RELEVANT UNDISPUTABLE FACTS

### I.     With Arbitrary Exceptions, San Francisco Bans All Commerce in "Fur Products."

#### A.     San Francisco Categorically Bans the Sale and Distribution of All Fur Products.

Effective as of January 1, 2020, the Fur Ban has made it "unlawful to sell, offer for sale, display for sale, trade, give, donate, or otherwise distribute a Fur Product by any means in San

Francisco."  S.F. Health Code § 1D.4.[1]  Under the Fur Ban, a "Fur Product" means "any article of clothing or covering for any part of the body, or any fashion accessory, including but not limited to handbags, shoes, slippers, hats, earmuffs, scarves, shawls, gloves, jewelry, and keychains, that is made in whole or in part of Fur.  'Fur Product' does not include dog or cat fur products."  *Id.* § 1D.3.  "Fur" is defined as "any animal skin or part thereof with hair, fleece, or fur fibers attached thereto, either in its raw or processed state."  *Id.*

For a law that purports to be about "treating all living beings, humans and animals alike, with kindness," *id.* § 1D.2(i), the Fur Ban sets forth a curious handful of exceptions (not least among them "dog or cat fur products").  "'Fur' does not include such skins or parts thereof as are to be converted into leather, which in processing will have the hair, fleece, or fur fiber completely removed; cowhide with hair attached thereto; or lambskin or sheepskin with fleece attached thereto."  *Id.* § 1D.3.[2]

The Fur Ban also allowed the unlimited sale of Fur Products made from furbearing and nongame mammals taken from the wild "under the authority of a trapping license" in California, such as badgers, beavers, otters, and raccoons —even minks and foxes.  Cal. Fish & Game Code § 4000. On January 1, 2020, however, a statewide ban on the trapping of furbearing and nongame mammals for commerce in fur — and on the sale of their raw fur — took effect.  Cal. Fish & Game Code §§ 4001, 4150.  Accordingly, the Fur Ban now bans Fur Products from all of these mammals as well.

**B.** **San Francisco Further Threatens to Apply Its Ban Even to Retailers of Fur Products Located *Outside* San Francisco.**

**1.** **The Fur Ban Is Enacted with the Understanding That It Does Not Prohibit Out-of-Town or Online Sales.**

When the Fur Ban was first heard in committee, its author requested that the City's own Chief Economist, Dr. Ted Egan, present an analysis of its potential economic impacts.  (*See* video of S.F.

---

[1]     The Fur Ban took effect on January 1, 2019, but provided that, until December 31, 2019, its enforcement provisions would not apply to "persons or entities" who sell Fur Products that had been purchased or obtained before March 20, 2018.  As of January 1, 2020, there is no such limit on its enforcement.  S.F. Health Code § 1D.4.

[2]     The Fur Ban includes a limited exception for "Used Fur Products," which it defines as meaning "a Fur Product that a person has acquired for his or her own use and worn."  S.F. Code § 1D.3.  The Fur Ban permits the "sale, offer for sale, display for sale, trade, gift, donation, or other distribution of" Used Fur Products "by a person not normally in the business of selling fur products, Non-profit Organization, or second-hand store, including a pawn shop."  *Id.* § 1D.4(c)(1).

Public Safety & Neighborhood Services Cmte. Mtg., Mar. 14, 2018, available at http://sanfrancisco.granicus.com/MediaPlayer.php? view_id= 10&clip_id=30010&meta_id=603303.) In his presentation on behalf of the City's Office of Economic Analysis, Dr. Egan included the following bullet point under the title "Details of the Proposed Legislation": "The possession of fur products is not banned; ***nor are out-of-town or online sales explicitly prohibited***. (*Id*.; Tenenbaum Decl. ¶ 2 & Ex. A [*Potential Impacts of a Fur Ban*, City & County of San Francisco, Office of the Controller (Mar. 14, 2018)] at p. 2 (emphasis added).) Later in that same presentation, under the title "Implications," the City's Chief Economist again noted for the committee that "***online and out-of-town purchases are not explicitly subject to the legislation***." (*Id*. at p. 6 (emphasis added).)

Following this presentation, the committee voted unanimously to recommend passage of the Fur Ban by the Board of Supervisors. (Tenenbaum Decl.¶ 3.) No member of the Board ever questioned this understanding of the Fur Ban's inapplicability to out-of-town or online sales or ever articulated any other interpretation. (*Id*.) The Board unanimously passed the Fur Ban on its first reading on March 20, 2018, and again unanimously passed it (as amended to include the provision in footnote 1, above) on a final vote on April 3, 2018. (*Id*.)

**2.    Defendant Colfax Threatens to Enforce the Fur Ban Against Retailers Outside San Francisco.**

The Fur Ban charges Defendant Colfax, as Director of the Department of Public Health, with its enforcement. S.F. Health Code §§ 1D.3, 1D.5(b). The Fur Ban further authorizes Defendant Colfax to "issue rules, regulations, and guidelines necessary or appropriate for the implementation and enforcement" of the Fur Ban. *Id*. § 1D.5(a). At some point after the Fur Ban took effect — but before May 11, 2019 — San Francisco's Department of Public Health published an online FAQ (i.e., Frequently Asked Questions page) "to address some of the most common questions about its enforcement of the Ordinance," which it noted was focused "on retail establishments that sell or facilitate the purchase of new fur products ***within the City***." (Tenenbaum Decl. ¶ 4 & Ex. B [FAQ as of May 11, 2019] (emphasis added).)

In his FAQ, Defendant Colfax took the position that retailers who are not even located in San Francisco violate the Fur Ban if anyone uses the Internet (or a telephone) to purchase a Fur Product

from them elsewhere in the world and shipped to a recipient in San Francisco.  Answering the question, "Would a retailer that is not physically located in the City violate the Ordinance if a customer purchases a fur product through the retailer's website and the fur product is physically distributed to the City?"  Defendant Colfax stated: "Yes.  Article 1D section 1D.4(a) prohibits the distribution of a fur product by any means in the City.  A retailer that sells a fur product and arranges for a fur product to be distributed to or from the City, violates section 1D.4(a) for distributing a fur product in the City."  *Id.*

As recently as January 2020, when IFF commenced this action, Defendant Colfax maintained this FAQ on the City's website to explain its enforcement policy.  (Tenenbaum Decl. ¶ 4.)

### 3. In Response to This Lawsuit, San Francisco Now Says It Is Not Enforcing the Fur Ban against Retailers Outside the City — But That It May "Decide in the Future to Pursue Enforcement."

In apparent recognition of the extent of their overreach, at some point *after* IFF filed its original complaint in this action, Defendants attempted to avoid this Court's adjudication of this claim by *changing* the online FAQ above.  On the same web page, the question and answer quoted above were deleted and replaced with the following:

> Does the Ordinance prohibit the sale of fur products purchased through a retailer's website and physically distributed to a location in San Francisco?
>
> Article 1D section 1D.4(a) prohibits the sale or distribution of a fur product by any means in the City, directly or indirectly, including through a retailer's website.  A retailer with a physical location in the City that sells or distributes a fur product to any location, including to an address in the City, violates section 1D.4(a) for selling or distributing a fur product in the City.  ***The Department is not enforcing the ordinance against retailers with no physical presence in the City.***  If the Department ***decides in the future to pursue enforcement against retailers with no physical presence in the City***, the Department will provide the public with advance notice regarding the Department's change in enforcement policy.

(Tenenbaum Decl. ¶ 5 & Ex. C.)  Defendants continue to take this position as of the filing of this motion.  (*See* https://www. sfdph.org/dph/EH/AnimalFur/faq.asp, last visited May 21, 2020.)

Notwithstanding Defendant Colfax's claim that he is not currently enforcing the Fur Ban against retailers with no physical presence in San Francisco — but that his office may "in the future"

- 5 -

decide to pursue enforcement at any point — these retailers of fur products continue to fear prosecution from Defendants and have been losing sales that they would otherwise be making if Defendants were enjoined from enforcing the Fur Ban.  (Reich Decl. ¶¶ 1, 5-6; Lin Decl. ¶ 5.)  To take just two examples, were it not for the threat of prosecution under the Fur Ban, Reich Furs in New York would be able to sell its fur products through its website outside New York and ship those products to recipients — whether the purchasers themselves or gift recipients — in San Francisco.  (Reich Decl. ¶¶ 1, 5-6.)  And, were it not for the threat of prosecution under the Fur Ban, B.B. Hawk in New Mexico would be able to accept telephone orders for its fur products and ship them to recipients in San Francisco.  (Lin Decl. ¶ 5.)

## II.   The Fur Ban Imposes a Complete Embargo on Tens of Millions of Dollars of Fur Products from Other States and Countries.

By its own terms, the Fur Ban imposes a complete market ban on commerce in Fur Products from other States and countries — and it does so to the tune of tens of millions of dollars.  The Fur Ban itself acknowledges the substantial market value of the fur industry — at just the raw pelt stage — in the United States alone.  The Fur Ban notes that "[i]n 2013, approximately 275 mink farms in 23 states across the United States produced about 3 million pelts, with an aggregate value of over $300 million.  As of 2015, mink pelt production in the United States totaled 3.76 million pelts."  *Id.* § 1D.2(d).  In terms of imports from other countries, trade data from the U.S. Census Bureau for 2019 show a total customs value of over $200 million for raw, tanned, and dresses furskins and fur apparel.  (Tenenbaum Decl. ¶ 7 & Ex. D.)  While fur products may be imported through anywhere in the United States and make their way to San Francisco (and vice versa), it is notable that nearly $27 million in fur products from other countries were imported to California in 2018, and that this figure was reduced by almost $6 million, to just over $21 million, in 2019.  (*Id.* ¶ 8 & Ex. E.)

At the retail level, San Francisco's own Chief Economist, asked by the Fur Ban's author to estimate the economic impact of the Fur Ban, used U.S. Census Bureau data to calculate that the potential impact in San Francisco was at least $10.8 million in 2012 — and reported that, according to a study by San Francisco's Chamber of Commerce, it was approximately $40 million in 2017.  (*Id.* ¶ 2 & Ex. A, pp. 3-4.)  Using the Chief Economist's figure of 52% growth in taxable retail sales in San

Francisco from 2012 to 2017, his $10.8 million estimate for Fur Products sales in 2017 would  be $16.4 million (and, at the same rate, over $20 million as of 2020).  (*Id.* at Ex. A, p. 5.)  And San Francisco's estimate (based on San Francisco's share of "all retail sales in California) may be regarded as conservative, since, as the City's Chief Economist recognized, San Francisco's Union Square "likely accounts for a disproportionate share of luxury retail sales, including fur products."  (*Id.* at Ex. A, pp. 3, 5.)

Plaintiff International Fur Trade Federation ("IFF") is an unincorporated association headquartered in the United Kingdom.  (Oaten Decl. ¶ 2.)  Established in 1949, IFF represents the international fur industry and regulates its practices and trade.  (*Id.*)  IFF represents 56 members associations in over 40 countries around the world.  (*Id.*)  The members encompass all parts of the fur trade, including farmers, trappers, auction houses, brokers, dressers, designers, manufacturers, and retailers.  (*Id.* ¶ 9.)  IFF promotes the business of fur by establishing certification and traceability programs on animal welfare and the environment.  (*Id.* ¶ 2.)

 IFF's pelt-producing constituents farm or trap animals all over the world, from Wisconsin (America's largest producer of mink) to Finland (the leading producer of fox fur) and Denmark (the leading producer of mink).  (Zimbal Decl. ¶ 1; Manakas Decl. ¶ 3.)  For example, one of IFF member Fur Commission USA's members is Zimbal Minkery, a family-owned business in Sheboygan Falls, Wisconsin.  (Zimbal Decl. ¶ 1.)  Zimbal operates one of the largest mink farms in the U.S., and its pelts are sold through international auctions in Finland and Denmark to manufacturers such as Reich Furs, Gorski Furs, and Pologeorgis Furs, all family-owned businesses that produce fur products from Zimbal's pelts and that regularly sold them in San Francisco prior to the Fur Ban taking effect — which they would resume immediately if enforcement of the Fur Ban were enjoined.  (Reich Decl. ¶ 2; Zimbal Decl. ¶ 4; Gorski Decl. ¶ 2; Pologeorgis Decl. ¶¶ 2-3; Lin Decl. ¶ 5; Stockall Decl. ¶ 7.)  As a result of Defendants' threat of enforcement of the Fur Ban, however, these sellers are continuing to suffer injury in the form of lost sales.  (Reich Decl. ¶ 4; Gorski Decl. ¶ 4; Pologeorgis Decl. ¶ 4; Lin Decl. ¶ 5.)

IFF's members' pelts are sold from international auction houses such as SAGA Furs, located in Finland, and Kopenhagen Fur, located in Denmark.  (Gorski Decl. ¶ 2; Pologeorgis Decl." ¶ 3; Reich

Decl ¶ 2; Zimbal Decl. ¶ 4; Stockall Decl. ¶ 8.)  The pelts are ultimately manufactured into garments and sold across the United States.  (Gorski Decl. ¶ 2; Reich Decl. ¶ 2; Pologeorgis Decl. ¶ 3.)

IFF itself is also suffering injury as an association in the form of a continuing drain on its resources as long as the Fur Ban remains in effect and — apart from the litigation of this action — the association must devote its resources to trying to ascertain and educate its members (and its members' members) as to the scope of the Fur Ban's application to them and to their customers.  (Oaten Decl. ¶ 9.)  Moreover, IFF is suffering a direct economic injury as a result of the Fur Ban because IFF receives and relies on a levy or assessment from each fur pelt sold at the auctions conducted by its members.  (*Id.*)

### III.    No Animals Are Farmed or Trapped for Their Fur in San Francisco.

Though the Fur Ban recites that "[m]ore than 50 million animals" are killed for their fur every year, and that the United States produced 3.76 million mink pelts in 2015, S.F. Health Code § 1D.2(b)-(c), ***there is no dispute that not a single animal is farmed or trapped for its fur in San Francisco***. (Herscovici Decl. ¶ 5.)

The Intervenor-Defendants even admit that "animals are not farmed or trapped for the purpose of harvesting their fur within the City and County of San Francisco at the present time."  (Dkt. 12-1 (Proposed Answer) at ¶ 4.)  They have also admitted that "no commercial fur farming or trapping businesses operated within the City and County of San Francisco" at the time the Fur Ban was passed in 2018.  (*Id.*)

Indeed, California Assembly Bill 273, which added section 4001 to the Fish and Game Code and took effect on January 1, 2020, has made it "unlawful for any person to trap any fur-bearing mammal for purposes of recreation or commerce in fur" anywhere in California — and further prohibits the sale in California of the "raw fur of a fur-bearing mammal otherwise lawfully taken pursuant to this code or regulations adopted pursuant to this code."  *See* Cal. Fish & Game Code § 4001.  The Senate Floor Analysis for AB 273 even reported that, in terms of fur-bearing animals ***trapped in California***, "[c]ollected data suggest that there were ***no fur sales in the state*** the last 3 years."  Cal. Sen. Rules Cmte., Analysis of AB 273, 2019-20 Reg. Sess., at 4 (Jun. 26, 2019).

\*    \*    \*

On January 13, 2020, within days after the Fur Ban went into full effect, IFF filed this action challenging the constitutionality of the Fur Ban and seeking declaratory and injunctive relief against its enforcement.  In response to Defendants' original motion to dismiss, IFF filed its First Amended Complaint (Dkt. 25) as of right on April 13, 2020, to include additional allegations about its standing in order to obviate that issue.

## ARGUMENT

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Here, while the parties may have differing feelings about fur, the undisputed facts about the Fur Ban entitle IFF to summary judgment.

## I.   IFF Is Entitled to Summary Judgment on Its First Cause of Action for a Declaratory Judgment That the Fur Ban Does Not Apply to Sales by Retailers Outside San Francisco.

As a threshold matter, the Court should grant summary judgment on IFF's claim for declaratory relief that the Fur Ban does not apply to sales of Fur Products by sellers outside San Francisco — such as over the Internet or by telephone — even if  a Fur Product is shipped to a recipient in the City.  While certain terms in the Fur Ban may be ambiguous, logic and the legislative history here make clear that the City's Board of Supervisors never intended to reach sales conducted online by retailers with no physical presence in San Francisco.  Indeed, as recounted above, they passed the Fur Ban based on the City's own express presumption that it would ***not*** apply to "online and out-of-town purchases."  (Tenenbaum Decl. ¶¶ 2-3 & Ex. A at pp. 2, 6.)  In apparent recognition of how it would even further impact commerce outside San Francisco of the Fur Ban, Defendants also insist today that they are not enforcing the Fur Ban against such sales.  But the Court must adjudicate this claim in any event to properly assess the full scope of the burden that the Fur Ban imposes on interstate and foreign commerce.

### A.   IFF Satisfies the Legal Standard for Declaratory Relief.

"In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration."  28

U.S.C. § 2201; Fed. R. Civ. P. 57.  Until the Fur Ban took full effect on January 1, 2020, IFF's

members (or its members' members) sold Fur Products in San Francisco — and they would continue

to do so today were it not for the threat of prosecution under the Fur Ban.  (Reich Decl. ¶¶ 3-6; Lin

Decl. ¶ 5; Oaten Decl. ¶ 9.)  As the Supreme Court has recognized, "[t]he dilemma posed by that

coercion — putting the challenger to the choice between abandoning his rights or risking prosecution

— is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate."

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).

This would be enough for IFF to satisfy the legal standard for declaratory relief.  Yet

Defendants now claim in an online FAQ that they are not currently enforcing the Fur Ban against

retailers with no physical presence in San Francisco — but that they may decide to pursue

enforcement at any point.  (Tenenbaum Decl. ¶ 5 & Ex. C; https://www.sfdph.org/dph/EH/AnimalFur/

faq.asp ("If the Department decides in the future to pursue enforcement against retailers with no

physical presence in the City …".)  But that does nothing to render this action unripe, moot, or

otherwise non-justiciable.  As described in statement of fact above, Defendants took this position only

***after*** IFF filed this action — having first published an online FAQ that said exactly the opposite.

(Tenenbaum Decl. ¶ 4 & Ex. B.)  In light of their flip-flop, Defendants' current claim is cold comfort

to online and out-of-state sellers of Fur Products who remain subject to prosecution whenever

Defendant Colfax unilaterally decides to go after them.

Retailers of fur products from IFF's members (and its members' members) continue to fear

prosecution from Defendants, and they continue to lose sales as a result of San Francisco's having

made their fur products unlawful for sale even outside San Francisco if shipped to a person in

California.  (Lin Decl. ¶ 1; Gorski Decl. ¶ 4; Pologeorgis Decl. ¶ 5; Reich Decl. ¶ 4.)  For example,

Reich Furs and B.B. Hawk sell fur products on their websites (or over the telephone) and are losing a

significant portion of their former sales in San Francisco as a result of Defendants' threatened

enforcement of the Fur Ban.  (Reich Decl. ¶¶ 4-5; Lin Decl. ¶ 5.)  *See National Audubon Society, Inc.*

*v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002) (finding claims justiciable where, facing California ban on

sale of furs from animals captured with certain traps, "the core of the trappers' injuries is not a

hypothetical risk of prosecution but rather actual, ongoing economic harm resulting from their

cessation of trapping").[3]

As another district court has explained in a similar circumstance, "Plaintiffs' need for certainty that Defendant won't prosecute them for selling their foie gras products is understandable — particularly given Defendant's coy reservation of the right to enforce [the statute at issue]." *Ass'n des Eleveurs de Canards et D'Oies du Quebec v. Harris*, 79 F. Supp. 3d 1136, 1143 (C.D. Cal. 2015), rev'd in part and vacated in part on other grounds sub nom. *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140 (9th Cir. 2017). Defendants cannot avoid an adjudication of this dispute by conveniently claiming — in response to this lawsuit — that they do not currently have sellers of IFF members' Fur Products in their sights. Defendants would have to definitively disavow any such future prosecution. "If the prosecutor *expressly agrees* not to prosecute , a suit against him for declaratory and injunctive relief is not such an adversary case as will be reviewed here." *Poe v. Ullman*, 367 U.S. 497, 507 (1961) (emphasis added).

Yet Defendants have refused to simply stipulate in this case that they will not go after online and out-of-state sales of Fur Products at any time in the future. (Tenenbaum Decl. ¶ 6.) Supreme Court precedent thus holds that this remains a justiciable controversy. *See also Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 302 (1979) (identifying justiciable controversy, even though "criminal penalty provision has not yet been applied and may never be applied to commissions of unfair labor practices" in part because "State *has not disavowed* any intention of invoking the criminal penalty provision against unions that commit unfair labor practices") (emphasis added). This Court should proceed to adjudicate IFF's First Cause of Action for a declaratory judgment that the Fur Ban does not apply to online or out-of-town sales.

**B.    The Fur Ban Applies Only to a Fur Product Sold or "Otherwise Distribute[d]"**
***in* San Francisco — Not to Products Sold by a Retailer Outside the City.**

The Fur Ban makes it "unlawful to sell … or otherwise distribute a Fur Product by any means in San Francisco." S.F. Health Code § 1D.4(a). 37.  There are at least five compelling reasons for concluding that the Fur Ban does not apply to products sold by out-of-town and online retailers located

---

[3]       "Economic injury caused by a proscriptive statute is sufficient for standing to challenge that statute." *Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013).

*outside* San Francisco, even if they are sent to an address in San Francisco.

First, the text of the Fur Ban includes the geographically limiting language "in San Francisco," such that it applies to sales only if they take place within the City.  The dictionary defines "sale" as "the act of selling — specifically:  the transfer of ownership of and title to property from one person to another for a price."  *See* https://www. merriam-webster.com/dictionary/sale.  On its face, the Fur Ban thus bars "the transfer of ownership of and title to" Fur Products only where that transfer takes place **in San Francisco**.

Second, the Fur Ban does not include any special, more expansive definition of "sell" — or of "distribute" — that would extend to sales outside San Francisco.  Turning to the dictionary again, Merriam-Webster, for example, includes multiple definitions for "distribute," the most relevant of which are "to divide among several or many" and  "to give out or deliver especially to members of a group," with a use note indicating that "DISTRIBUTE implies an apportioning by separation of something into parts, units or amounts // *distributed* food to the needy."  *See* https://www.merriam-webster.com/dictionary/distribute.  The Oxford University Press's "US Dictionary" also includes multiple definitions, the most relevant of which is "Supply (goods) to stores and other businesses that sell to consumers."  *See* https://www.lexico.com/en/definition/ distribute.  None of these definitions can fairly be construed to include the shipment of a product from outside California directly to a consumer in San Francisco.  Legislatures know how to ban online or remote sales if that is their actual intention.  *Cf.* Cal. Health & Safety Code § 108042(k) ("Sell" or "sale" "means a transfer for consideration of title … including, but not limited to, transactions conducted through … the Internet or any other similar electronic means.").

Third, it would defy logic to conclude that the City's Board of Supervisors intended to allow any resident of San Francisco to shop for a Fur Product while outside the City and transport it back to San Francisco himself or herself — as the Fur Ban certainly allows — while somehow banning that same resident from using the services of a common carrier like FedEx, UPS, and the U.S. Post Office to transport it for him.  In addition, if "distribute a Fur Product by any means in San Francisco" meant that the act of shipping a Fur Product from outside San Francisco to a recipient in the City in connection with an online or out-of-town sale is unlawful, then any of these carriers would be

- 12 -

complicit in violations of the law.  Statutes are construed to avoid absurdities.

Fourth, under the "doctrine of constitutional avoidance," laws should not be construed to raise constitutional issues "if any other possible construction remains available."  *People v. Garcia*, 2 Cal.5th 792, 804 (2017).  This canon "reflects the prudential concern that constitutional issues not be needlessly confronted."  *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  Here, declaring that the Fur Ban's prohibition on products sold "in San Francisco" does not apply to online or out-of-town retailers physically located outside San Francisco will avoid further magnifying the burden that the Fur Ban already imposes on interstate commerce.

Finally, and perhaps most persuasive, is that there is no evidence of any intent by the Board of Supervisors to extend the Fur Ban to online or out-of-town sales of Fur Products, even if shipped to a recipient in the City.  The California Supreme Court applies a "presumption against extraterritoriality."  "However far the Legislature's power may theoretically extend, we presume the Legislature did not intend a statute to be operative, with respect to occurrences outside the state, ... unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history."  *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 1207 (2011) (cleaned up).  Here , as recounted above, San Francisco's own Chief Economist reiterated to the Fur Ban's author during his committee presentation that "online and out-of-town purchases are not explicitly subject to the legislation" — and no member of the Board ever questioned that interpretation.  (Tenenbaum Decl. ¶¶ 2-3 & Ex. A.)

The Court should accordingly issue a declaratory judgment that the Fur Ban does not apply to online or other remote sales of Fur Products by a retailer physically located outside San Francisco, even if a product is shipped to a recipient in the City.

## II.    IFF is Entitled to Summary Judgment on Its Causes of Action Alleging That the Fur Ban Violates the Dormant Commerce Clause Because the Fur Ban Imposes a Substantial Burden on Interstate and Foreign Commerce that Clearly Exceeds Any "Putative Local Benefits."

The heart of this case is IFF's challenge to the Fur Ban based on the balancing test established by the Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  The specific issues to be

- 13 -

decided are set forth on page vi above, as required by this Court's Local Rule 7-4(a)(3).  Can anyone say with a straight face that a **complete ban** on all commerce in Fur Products in San Francisco — closing a market to tens of millions of dollars of annual sales of Fur Products that come exclusively from other States and countries  — does not place a substantial burden on interstate and foreign commerce?  Likewise, can the Fur Ban's putative purpose of "treating all living beings, humans and animals alike, with kindness" or even of "protecting the environment" (as Defendants alternatively portray it) constitute a legitimate **local** interest where not a single Fur Product is made from an animal farmed or trapped (or even processed) in San Francisco?  Unless the Court believes the Constitution allows a city or State to wall off its markets to lawful commerce from the rest of the Nation (and the world) without any threat to the health or safety of any of its people — or any of its animals — the answers to these questions must be no, and the Fur Ban must be declared and enjoined as an unconstitutional burden on commerce.

> **A.**    **The Legal Standard Established in *Pike v. Bruce Church, Inc.*,  Requires This Court to Determine Whether the Fur Ban Substantially Burdens Interstate or Foreign Commerce and to Ascertain Whether the Fur Ban Serves a "Legitimate Local Purpose."**

The Commerce Clause of the United States Constitution empowers Congress "to regulate commerce with foreign nations, and among the several states[.]"  U.S. Const. Art. 1, § 8, cl. 3. Implicit from this express grant of power to Congress is a limitation on states' and cities' authority to enact laws that burden interstate and foreign commerce, which limitation is known as the dormant Commerce Clause doctrine.  While lower courts have ascribed various purposes to the Commerce Clause, the Supreme Court has repeatedly emphasized that "[t]he very purpose of the Commerce Clause was to create an area of free trade among the several States."  *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 370 (1976).

The Supreme Court's (and Ninth Circuit's) test for whether a state or local law that impacts interstate commerce violates the dormant Commerce Clause is as follows:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.  If a legitimate local

purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*See, e.g.*, *Yakima Valley Memorial Hosp. v. Washington State Dep't of Health*, 731 F.3d 843, 846 (9th Cir. 2013), quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Under *Pike*, even "where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental," it will ***not*** be upheld if "the burden imposed on such commerce is ***clearly excessive*** in relation to the putative local benefits."  *Pike*, 397 U.S. 137 at 142 (emphasis added).  This is sometimes referred to as *Pike* balancing — a test the Fur Ban flunks in this case.

### B.   The Fur Ban Does Far More Than "Substantially" Burden Interstate and Foreign Commerce in Fur Products.

While *Pike* requires only "incidental" effects on interstate commerce to trigger its balancing test, the Ninth Circuit has engrafted upon it a prerequisite that the burden on commerce be "significant" or "substantial."  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012).  IFF easily establishes that here.  Because the Fur Ban effectuates a ***complete*** market ban on ***all commerce*** in Fur Products between San Francisco and other States and countries, the Fur Ban imposes the most substantial possible burden of all.

Indeed, it is hard to imagine legislation that would more substantially burden commerce in the market for a category of goods than a categorical ban on the sale and distribution of such goods.  For example, a tax of 50% would place a major burden on commerce in any product, but, as substantial as that would be, it pales in comparison to a ***total prohibition*** of all Fur Products.  To conclude that San Francisco can close its market to ***all*** interstate and foreign commerce in Fur Products and yet somehow not substantially burden such commerce would be to ignore economic reality and the very underpinnings of the Commerce Clause.  As the Ninth Circuit has recently reiterated, the dormant Commerce Clause ensures that States do not inhibit "the overriding requirement of freedom for the national commerce."  *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Circ. 2015) (citation omitted).

Here, the dollar volume of lost commerce only further shows that the burden is substantial. The City's own estimate of the size of the market for Fur Products was $10.8 million as of 2012. (Tenenbaum Decl. ¶ 2 & Ex. A (*Potential Impacts of a Fur Ban*, City & County of San Francisco, Office of the Controller (Mar. 14, 2018), at p. 3).)  And the City cited a survey by the San Francisco Chamber of Commerce that showed the market for fur products in San Francisco to be approximately $40 million, a difference which the City's Chief Economist acknowledged could be explained by the fact that San Francisco "likely" accounts for a disproportionate share of retail sales of fur products. (*Id*. at p. 5.)  According to the City's reference to data from the U.S. Census Bureau's 2012 Economic Census, the category of "Furs and Fur Garments" alone consisted of $355 million in sales in California in 2012.  (*Id*. at p. 3.)  (By comparison, according to the state's official statistics, California is the nation's third largest producer of asparagus, and yet the market value of California's entire asparagus production was reportedly only $16.3 million in 2017.  *See California Agricultural Statistics Review 2017-2018*, at p. 11, available at https://www.cdfa.ca.gov/statistics/ PDFs/2017-18AgReport.pdf.)

It should be remembered that, in *Pike*, a $200,000 expense for a single business was recognized as an undue burden on commerce.  *Pike*, 397 U.S. 137 at 146.  Thus, instead of quarreling over the extent of the burden on commerce, IFF expects that Defendants will argue that a ban that does not discriminate between in-state and out-of-state interests cannot be substantial.  But that makes no sense in light of the Supreme Court's clear instructions in *Pike*, which require a court to engage in balancing of the burdens on commerce with a statute's putative local benefits in cases "[w]here the statute regulates evenhandedly."  *Pike*, 397 U.S. at 142.  Indeed, in *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1078 (9th Cir. 2013), the Ninth Circuit remanded for the district court to consider whether the regulations at issue discriminate "in purpose or in practical effect" and — "*if not*" — then to "apply the balancing test established in *Pike*."[4]

---

[4]      IFF expects that Defendants will also cite the Ninth Circuit's opinion in *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013), in support of an argument that even a "complete" ban that disproportionately affects out-of-state producers does not substantially burden interstate commerce.  But that case is readily distinguished from this one.  In *Ass'n des Eleveurs*, the Ninth Circuit was reviewing a preliminary injunction ruling in a case involving a ban on poultry liver products that result from force feeding birds.  The panel found no substantial burden because the district court had said that the loss of over $5 million dollars in sales of the plaintiffs'

In light of the indisputable facts above, San Francisco's complete market ban on Fur Products from all other States and countries imposes a "substantial" burden on interstate and foreign commerce.

### C.   The Purposes Set Forth in the Fur Ban Are Neither "Local" Nor "Legitimate."

As a definitional matter, in balancing the burden on commerce with any "legitimate local public interest," *Pike* requires a court to consider the question "of degree" only "[i]f a legitimate local purpose is found" in the first place.  *Pike*, 397 U.S. at 142.  *Pike* thus requires this Court to determine that the Fur Ban serves a purpose that is both *local* and *legitimate*.  As IFF establishes here, the purported benefits of the Fur Ban are "illusory or nonexistent" — and are unquestionably not *local*.  *Yakima Valley Mem'l Hosp.*, 731 F.3d at 849.

Even viewing the Fur Ban's stated purposes with respect for the genuineness of its intentions, the Fur Ban does not advance any legitimate local purpose.  The Fur Ban justifies a categorical ban on fur based on the following litany of assertions:

- "[F]ur is less of a necessity and more of a luxury."  *Id.* § 1D.2(a).

- "Fur garments are now typically designed for fashion rather than warmth."  *Id.*

- "[M]ore animals are now killed to make decorative fur trim than to manufacture full fur garments."  *Id.*

- "More than 50 million animals are violently killed for their fur every year," and "[m]ajor producers of fur include the United States, Canada, and Scandinavian countries."  *Id.* § 1D.2(b).

- "More than 85% of pelts in the world's fur trade come from fur farms," most commonly "mink, fox, marten, and chinchilla."  *Id.* § 1D.2(c).

- "The majority of pelts produced annually are mink.  In 2013, approximately 275 mink farms in 23 states across the United States produced about 3 million pelts, with an aggregate value of over $300 million."  *Id.* § 1D.2(d).

- "Fur farming can be damaging to the environment and contributes to water and air pollution."  *Id.* § 1D.2(e).

- "Fur processing often involves the use of harmful chemicals including chromium and formaldehyde."  *Id.*

- Fur farming "consumes significant quantities of energy."  A fur coat requires "over 15

multiple duck products "overestimate[d]" the impact on commerce and  because it included products that were "not covered by" the ban.  729 F.3d at 952.  At any rate, if a complete ban on all products from other States and countries in an industry such as fur does not substantially burden interstate and foreign commerce in a way that limits free trade, it is hard to conceive of a restriction on commerce that does.

times" the energy of a fake fur garment.  "For each kilogram of factory-farmed mink fur, 110 kilograms of carbon dioxide is produced."  *Id.* § 1D.2(f).

- "Existing laws require relatively little oversight of the fur farming and fur trade industries.  Compliance with guidelines issued by the American Veterinary Medical Association is not mandatory, and fur farms are not monitored by any government agency."  *Id.* § 1D.2(g).

- "The sale of fur products in San Francisco is inconsistent with the City's ethos of treating all living beings, humans and animals alike, with kindness.  In light of the wide array of faux fur and other alternatives for fashion and apparel, the demand for fur products does not justify the unnecessary killing and cruel treatment of animals.  Eliminating the sale of fur products in San Francisco will promote community awareness of animal welfare, bolster the City's stance against animal cruelty, and, in turn, foster a more humane environment in San Francisco."  *Id.* § 1D.2(i).

S.F. Health Code § 1D.2 ("Findings and Purpose").  This is the proverbial spaghetti thrown on the wall in the hope that something will stick.  Here, a careful examination of this list reveals that the Fur Ban is not justified by any "legitimate local interest."

### 1.    The Putative Purpose Referring to Animal Welfare Is Certainly Not "Local."

Ninth Circuit case law holds that a state may regulate in a manner that burdens interstate commerce only to address "***local*** harms," *Rocky Mountain Farmers Union*, 730 F.3d at 1103-04 (emphasis added), or "minimize the ***in-state*** harm caused by products sold in-state," *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 952–953 (9th Cir. 2019) ("*Rocky Mountain II*") (emphasis added) (explaining that California is not empowered to regulate fuel production and use merely because "it thinks that it is the state that knows how best to protect Iowa's farms, Maine's fisheries, or Michigan's lakes").  Here, no ***local*** interest in preventing the "unnecessary killing" of animals, promoting a "more humane environment," or treating living beings with "kindness" is served by the Fur Ban because no animals are farmed or trapped for their fur ***in San Francisco***.  (Whelan Decl. ¶ 8; Herscovici Decl. ¶ 8; Dkt. 12-1 at ¶ 4.)

Given the prerequisite that any burden on interstate or foreign commerce be the result of addressing a ***local*** harm, the Court's inquiry should stop here:  the Fur Ban fails the test in *Pike* as most recently upheld by the Ninth Circuit in the *Rocky Mountain* cases.  *See Pike*, 397 U.S. at 142.  Supreme Court precedent supports IFF on this point as well.  In *Edgar v. MITE Corp.*, 457 U.S. 624, 642 (1982), an Illinois law placed certain requirements on tender offers made to shareholders of

- 18 -

corporations that either were organized in Illinois, had their principal executive office in Illinois, or had at least 10% of their stated capital and paid-in surplus represented in Illinois.  An out-of-state offeror challenged the law under *Pike*, and the Illinois Secretary of State tried to defend it on the grounds that it served two seemingly legitimate local interests:  protecting resident shareholders and regulating the internal affairs of Illinois companies.  *Id*. at 644.

The Supreme Court plurality rejected this:  "While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders." *Id*.; *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 93 (1987) ("Indiana has no interest in protecting nonresident shareholders of nonresident corporations."); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 70-71 (1st Cir. 1999) (footnote omitted), aff'd sub nom. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (noting that Supreme Court "has not suggested that moral concerns regarding human rights conditions abroad" are valid state concern and holding that claim of "local purpose" for Massachusetts law disfavoring goods from Burma "is very weak and does not suffice").  If, as the Supreme Court has held, protecting nonresident *human rights* is not to be considered a legitimate interest for *Pike* balancing, then, a fortiori, San Francisco's purporting to protect nonresident animals is not either.

a.     **The Putative Purpose Referring to Animal Welfare Is Also Not Even Legitimate as to Fur from IFF's Members.**

Even if the lives of furbearing animals raised in Wisconsin, Finland, or Denmark were somehow considered a valid *local* interest within the police power of San Francisco — and, unless words have no meaning, it can't be — it would not be a legitimate one with respect to Fur Products from the pelts of animals farmed or trapped in the States and countries where most fur comes from.  In the first place, the federal Fur Products Labeling Act, 15 U.S.C. §§ 69, and the Federal Trade Commission regulations enacted thereunder, 16 C.F.R. §§ 301.0 *et seq*., include thorough require-ments for the labeling of every "article of wearing apparel made in whole or in part of fur," including its country of origin, so consumers can know where the fur in the clothes they buy comes from.  15 U.S.C. §§ 69(d), 69b(2).  For domestic fur, as an example, Wisconsin is the largest producer of mink pelts in the United States.  It of course has a prohibition on "mistreating animals" that makes it

unlawful for a person to "treat any animal, whether belonging to the person or another, in a cruel manner," and it defines "cruel" to mean causing "unnecessary and excessive pain or suffering or unjustifiable injury or death." Wisc. Stat. § 941.02. And European producers of fur, such as Finland and Denmark, are subject to regulation under the European Convention for the Protection of Animals Kept for Farming Purposes (available at https://www.coe.int/en/ web/conventions/full-list/-/conventions/treaty/087/signatures?p_auth=5AndWVrY) — which aims to avoid "unnecessary suffering" — in addition to those countries' national laws. (*See also* Stockall Decl. ¶ 7 (citing Agreement on International Humane Trapping Standards (to which European Union, Canada, and Russia are signatories).)

Moreover, each of IFF's members has signed a strict code of conduct committing them to uphold the industry-relevant laws they fall under in their home countries, including laws relating to animal welfare. (Stockall Decl. ¶ 2.) In addition, 90% of mink in the United States comes from farms certified under the "Standard Guidelines for the Operation of Mink Farms." (*Id*. ¶ 5.) And 97% of the approximately 3,000 fur farms operating in Europe are certified under the WelFur program, which is a welfare assessment program developed by independent scientists at seven European universities. (*Id*. at ¶¶ 3-4.) San Francisco's ban on all Fur Products from these foreign jurisdictions — passed without any regard for the existing animal welfare standards in any of these places — has no legitimacy in light of the animal protection measures put in place by the governments actually responsible for the welfare of their own animals.

San Francisco's claim that a ban on the sale of fur products somehow reflects its superior interest in protecting animals from being farmed or trapped for their fur is especially questionable given that San Francisco ***does not even prohibit fur farming within its own borders*** (and only bans trapping of furbearing animals in a park or with the use of a steel-jawed leg-hold trap**)**. S.F. Park Code § 5.08; S.F. Port Code § 4.7; S.F. Police Code § 488. As the Supreme Court observed in *Edgar*, a claimed legislative interest is illusory where the government "completely exempts from coverage" a whole class of similar activity within its own jurisdiction. 457 U.S. at 644 (noting that imposing requirements on tender offers while exempting corporation's offer to acquire its own shares "is at variance with Illinois' asserted legislative purpose, and tends to undermine [its] justification for the

burdens the statute imposes on interstate commerce").  As another example of its irrationality, the Fur Ban prohibits the sale of finished fur products made from dead rabbits from other States and countries, but the same codebook allows live rabbits to be sold *in San Francisco* to be raised for human carnivores.  S.F. Heath Code § 1C.3(b).

### 2. The Putative Purposes Referring to the Environment, Energy Consumption, and Chemicals Are Certainly Not "Local."

Like its incantation about animal welfare, the Fur Ban's putative purpose of protecting the environment is wholly untethered to any activity *in San Francisco*.  San Francisco's purported interest in prohibiting fur based on the claim that fur farming "can be damaging to the environment," "consumes significant quantities of energy," and produces "carbon dioxide," or that fur processing "often involves use of harmful chemicals including chromium and formaldehyde," is not local (or legitimate) as applied to IFF's members' fur products because it is undisputed that ***no fur farming or processing takes place in San Francisco***.  San Francisco's waters are not even touched (let alone contaminated), its air is not even exhaled (let alone polluted), and its environment is not degraded *at all* by the farming and processing of fur products in Wisconsin, Finland, Denmark, or anywhere else in the world.  So these cannot be legitimate *local* interests in this case.

### a. The Putative Purposes Referring to the Environment, Energy Consumption, and Chemicals Are Also Illusory, Irrational, and Pretextual as to Fur from IFF's Members.

As the Supreme Court has explained, the mere "incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack."  *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (plurality).  "Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause."  *Id*.  Apart from San Francisco's purported environmental concerns being decidedly not local, they are also not legitimate.  As one example of how illusory the "environmental" interests are, so-called "faux fur" — which the Fur Ban urges as an alternative to natural fur, *see* S.F. Health Code § 1D.2(i) — is made from fossil fuels (i.e., petroleum), not exactly a favorite among most environmentalists.  (Stockall Decl. ¶ 9; Herscovici Decl. ¶ 6.)

In addition, the trapping of wild fur is strictly regulated in North America by state, provincial, and territorial wildlife biologists.  (Herscovici Decl. ¶ 2.)  These regulations are effective:  the most important North American furbearers (beaver, muskrat, marten, coyote, fox, raccoon) are abundant today  — in some cases more abundant than they have ever been.  (*Id.*)  For their part, fur farms also contribute to environmental sustainability in several important ways.  Mink and fox are the most commonly farmed furbearers.  (*Id.* ¶ 4.)  They are fed leftovers from human food-production, e.g. the parts of cows, chickens, fish and other food animals that we don't eat.  (*Id.*)  In some cases this may be almost 50 percent of the total biomass that would  otherwise go into landfills.  (*Id.*; Stockall Decl. ¶ 9.)  And the farmed fur animals' manure, carcasses and soiled straw bedding are used to produce biofuels or organic fertilizers, thus completing the nutrient cycle.  (*Id.*; Whelan Decl. ¶ 6.)

While San Francisco purports to be concerned about "harmful" levels of chromium and formaldehyde involved in fur processing, San Francisco itself does not even have any regulations regarding the use of these common chemicals *within San Francisco*.  Indeed, San Francisco does not even ban any other product on the basis that its product involves — or that it even contains — chromium or formaldehyde, such as permanent press clothing.  *See* https://www.p65warnings.ca.gov/fact-sheets/formaldehyde.  In any event, merely mentioning an omnipresent chemical does not provide a legitimate legislative purpose for banning all fur products, especially since fur processing in North America and Europe does not even involve the use of formaldehyde.  (Stockall Decl. ¶ 5; Oaten Decl. ¶ 6; Stockall Decl. ¶ 6; Sixt Decl. ¶ 6.)  The pretextual nature of San Francisco's environmental justifications for the Fur Ban should be plain.

### D.   The Fur Ban's Complete Ban on All Interstate and Foreign Commerce in Fur Products Clearly Exceeds Any Putative Local Benefits.

"Our system, fostered by the Commerce Clause, is that every farmer and every craftsman" — such as those in this very case — "shall be encouraged to produce by the certainty that he will have *free access to every market in the Nation*, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them."  *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949) (emphasis added).  The Commerce Clause thus guarantees that "this Nation is a common market in which state lines cannot be made barriers to the free flow of both raw

materials and finished goods." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012), quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 803 (1976).

This Court does not need special scales of justice — or belabored argument on this point — to recognize by this point that the Fur Ban unduly burdens commerce.  On one side of the balance is a complete market ban on all commerce in Fur Products — tens of millions of dollars of it — the entirety of which comes not just from outside San Francisco but from other States and countries.  One might expect a State to strike with such a heavy economic bludgeon out of necessity protect the health or safety of its inhabitants (whether human or animal).  "States may not impose undue burdens on interstate commerce." *South Dakota v. Wayfair*, 138 S. Ct. 2080, 2091 (2018).  But the City cannot offer any such justification in this case.  Rather, after cutting through the pretexts and happy talk in section 1D.2 of the Fur Ban, all that one finds on the other side of the balance is the City's putative interest in the farming and trapping of animals for fur far outside San Francisco.  The burden on interstate and foreign commerce thus clearly exceed the putative local benefits.

**E.** **Any Legitimate Interest Sought to Be Effectuated Locally by the Fur Ban Could Be Promoted by Multiple Alternative Means with Far Lesser Impacts on Commerce.**

The balancing in this case should not even be a close call.  But even if it were, *Pike* requires the Court to consider whether the government's putative local interest "could be promoted as well with a lesser impact on interstate activities" so as to determine "the extent of the burden" on commerce "that will be tolerated." *Pike*, 397 U.S. at 142.  Here, the availability of even more effective alternatives with far less draconian impacts on commerce in fur only further warrants entry of summary judgment in IFF's favor.  The Supreme Court has looked critically at restrictions that operate as an "outright ban," even if applied to both in-state and out-of-state products and even if enacted to protect human consumers. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 353-54 (1977) (explaining that multiple "alternatives to the outright ban of Washington State grades are readily available").

Even if the Fur Ban did confer any putative local benefits, whether as an exercise in virtue-signaling or otherwise, the San Francisco Board of Supervisors' interest in expressing its dislike of fur

- 23 -

products could be promoted just as well — or even better — without a complete market ban.  Such alternatives include but are not limited to passing a resolution expressing whatever unfavorable views the Board has about fur, as it has done in the past with a resolution "[u]rging San Franciscans not to purchase eggs produced by caged hens and opposing the factory farming practice of confining egg-laying hens in battery cages."  S.F. Resolution No. 20-08.  Or the Board could more publicly express "promote community awareness of animal welfare."  Indeed, as compared to the mere absence of genuine fur products from store shelves (which projects no message at all), a single billboard in Union Square telling consumers not to buy fur (pointing them to a website with the text of the "Findings and Purpose" section of the Fur Ban) — or perhaps even telling them to "Go Vegan" — would do more for the City's putative interest in bolster[ing] the City's stance against animal cruelty."

Or San Francisco could even require all sellers of fur products to make certain disclosures as to whether their products have obtained certification from WelFur or FurMark — or any other indicator of their compliance with animal welfare standards.  Or, to the extent that San Francisco genuinely believes that shoppers should avoid purchasing natural fur products and instead keep warm with fake fur from petroleum, it could tax the former and subsidize the latter.

It is notable that, for bottled water — which the City similarly declared "bad for the environment," adding to "greenhouse gas emissions," and "potentially a health hazard" — the City believes it can be "a good environmental steward" without banning it but instead "promoting water conservation efforts and educating residents" about the benefits of tap water.  S.F. Environment code §§ 2301 *et seq.*  Similarly, for meat and poultry raised using antibiotics, the City believes it "can play a pivotal role" not by banning it but by "explaining the myriad policies" on such use.  S.F. Environment Code §§ 2701 *et seq.*  In any event, as compared to any of the alternatives above, it goes beyond overkill to do what San Francisco has done here in imposing a categorical ban on interstate and foreign commerce.

*              *              *

The Fur Ban's complete closure of San Francisco's market to all Fur Products in interstate and foreign commerce imposes a substantial burden on such commerce that is clearly excessive in relation to any putative local benefits in San Francisco.  The Fur Ban thus violates the Commerce Clause.

1

## CONCLUSION

2       For the foregoing reasons, Plaintiff's motion for summary judgment should be granted.

3                                          Respectfully submitted,

4   Dated:  May 21, 2020                   /s/ Michael Tenenbaum

5                                          Michael Tenenbaum, Esq.
                                           *mt@post.harvard.edu*
6                                          THE OFFICE OF MICHAEL TENENBAUM, ESQ.

7                                          *Counsel for Plaintiff International Fur Trade Federation*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT — 3:20-cv-00242-RS