Michael Tenenbaum, Esq. (No. 186850)
*mt@post.harvard.edu*
THE OFFICE OF MICHAEL TENENBAUM, ESQ.
1431 Ocean Ave., Ste. 400
Santa Monica, CA  90401
Tel     (424) 246-8685
Fax     (424) 203-4285

*Counsel for Plaintiff International Fur Trade Federation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL FUR TRADE FEDERATION, an unincorporated association;<br><br>Plaintiff,<br><br>– against –<br><br>CITY AND COUNTY OF SAN FRANCISCO; and<br><br>DR. GRANT COLFAX, an individual, in his official capacity as Director of the San Francisco Department of Public Health;<br><br>Defendants,<br>and<br><br>THE HUMANE SOCIETY OF THE UNITED STATES; and<br><br>ANIMAL LEGAL DEFENSE FUND;<br><br>Intervenor-Defendants. | Case No. 3:20-cv-00242-RS<br><br>**PLAINTIFF'S COMBINED[1] OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (DKT. 30) AND INTERVENORS' MOTION TO DISMISS (DKT. 33)**<br><br>Date:         July 23, 2020<br>Time:         1:30 p.m.<br>Courtroom:   3<br><br>Hon. Richard Seeborg<br><br>ORAL ARGUMENT REQUESTED |

---

[1]      To avoid repetition (and because Intervenors' motion to dismiss duplicates much of Defendants' motion), this brief combines IFF's opposition to both motions to dismiss (Dkts. 30 & 33). IFF uses the term "Defendants" to refer to the government defendants, "Intervenors" to refer to the intervenor-defendants, and "Movants" to refer to them both.

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF OPPOSITION.................................................................1

THE RELEVANT FACTUAL AND PROCEDURAL BACKGROUND..........................................3

I.    With Arbitrary Exceptions, San Francisco Bans All Commerce in "Fur Products"................3

    A.    San Francisco Categorically Bans the Sale and Distribution of All Fur
    Products.................................................................................................................3

    B.    San Francisco Further Threatens to Apply Its Ban Even to Retailers of Fur
    Products Located *Outside* San Francisco ...........................................................3

        1.    The Fur Ban Is Enacted with the Understanding That It Does Not
        Prohibit Out-of-Town or Online Sales............................................3

        2.    Defendant Colfax Threatens to Enforce the Fur Ban Against
        Retailers Outside San Francisco. .....................................................4

        2.    In Response to This Lawsuit, Defendant Colfax Now Says He Is
        Not Enforcing the Fur Ban against Retailers Outside the City —
        But That He May "Decide in the Future to Pursue Enforcement"...............5

II.   The Fur Ban Imposes a Complete Embargo on Tens of Millions of Dollars of Fur
    Products from Other States and Countries ............................................................6

III.  No Animals Are Farmed or Trapped for Their Fur in San Francisco ...................................7

ARGUMENT ...............................................................................................................................8

I.    The Legal Standard on a Motion to Dismiss Requires the Court to Accept IFF's
    Well-Pleaded Factual Allegations as True and Draw All Reasonable Inferences in
    IFF's Favor................................................................................................................8

II.   IFF Has Sufficiently Alleged a Claim in the First Cause of Action for a Declaratory
    Judgment That the Fur Ban Does Not Apply to Sales by Retailers Located Outside
    San Francisco ...........................................................................................................8

    A.    IFF Satisfies the Legal Standard for Declaratory Relief..........................................8

    B.    The Court Should Declare In Its Judgment that the Fur Ban Does Not
    Apply to Sales by Retailers Located Outside San Francisco ..................................14

III.  IFF Sufficiently Alleges Its Causes of Action Asserting That the Fur Ban Violates
    the Dormant Commerce Clause Because the Fur Ban Imposes a Substantial Burden
    on Interstate and Foreign Commerce that Clearly Exceeds Any "Putative Local
    Benefits".................................................................................................................15

A.  Under the Legal Standard Established in *Pike v. Bruce Church, Inc.*, IFF Need Only Plead that the Fur Ban Imposes a Substantially Burden on Interstate or Foreign Commerce That Is Clearly Excessive in Relation to Any "Legitimate Local Purpose" ...........................................................................16

B.  The Fur Ban Does Far More Than "Substantially" Burden Interstate and Foreign Commerce in Fur Products ..............................................................17

C.  The Purposes Set Forth in the Fur Ban Are Neither "Local" Nor "Legitimate" ...........................................................................................20

   1.  The Putative Purpose Referring to Animal Welfare Is Certainly Not "Local" ............................................................................................21

      a.  The Putative Purpose Referring to Animal Welfare Is Also Not Even Legitimate as to Fur from IFF's Members .........................23

   2.  The Putative Purposes Referring to the Environment, Energy Consumption, and Chemicals Are Certainly Not "Local" .............................24

      a.  The Putative Purposes Referring to the Environment, Energy Consumption, and Chemicals Are Also Illusory, Irrational, and Pretextual as to Fur from IFF's Members .................25

D.  The Fur Ban's Complete Ban on All Interstate and Foreign Commerce in Fur Products Clearly Exceeds Any Putative Local Benefits......................................26

E.  Any Legitimate Interests Sought to Be Effectuated Locally by the Fur Ban Could Be Promoted by Multiple Alternative Means with Far Lesser Impacts on Commerce.................................................................................27

CONCLUSION.................................................................................................29

PLAINTIFF'S COMBINED OPPOSITION TO MOTIONS TO DISMISS — 3:20-cv-00242-RS

# TABLE OF AUTHORITIES

**Cases**

*Alfaro-Orellana v. Ilchert*,
  720 F. Supp. 792 (N.D. Cal. 1989) ........................................................... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. 8

*Ass'n des Eleveurs de Canards et D'Oies du Quebec v. Harris*,
  79 F. Supp. 3d 1136 (C.D. Cal. 2015) ..................................................... 10

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013) ................................................................... 19

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
  870 F.3d 1140 (9th Cir. 2017) ................................................................. 10

*Babbitt v. United Farm Workers National Union*,
  442 U.S. 289 (1979) ............................................................................... 10

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 8

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*,
  511 U.S. 383 (1994) ............................................................................... 24

*Cavel Int'l, Inc. v. Madigan*,
  500 F.3d 551 (7th Cir. 2007) ................................................................... 22

*Chinatown Neighborhood Ass'n v. Harris*,
  794 F.3d 1136 (9th Cir. 2015) ........................................................... 22, 26

*Citizens for Honesty & Integrity in Reg'l Planning v. Cty. of San Diego*,
  399 F.3d 1067 (9th Cir. 2005) ................................................................. 10

*Citizens for Honesty & Integrity in Reg'l Planning v. Cty. of San Diego*,
  258 F. Supp. 2d 132 (S.D. Cal. 2003) ...................................................... 11

*Cresenzi Bird Importers, Inc. v. State of N.Y.*,
  658 F. Supp. 1441 (S.D.N.Y. 1987) ......................................................... 23

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ............................................................................... 22

*CTS Corp. v. Dynamics Corp. of America*,
  481 U.S. 69 (1987) ................................................................................. 22

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) ...................................................................................................... 22

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,
   476 F.3d 326 (5th Cir. 2007) ........................................................................................ 22

*Florida Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963) ...................................................................................................... 27

*Great Atl. & Pac. Tea Co.*,
   424 U.S. 366 (1976) ................................................................................................. 1, 16

*Green Party of Tennessee v. Hargett*,
   791 F.3d 684 (6th Cir. 2015) ........................................................................................ 13

*H.P. Hood & Sons, Inc. v. Du Mond*,
   336 U.S. 525 (1949) ........................................................................................................ 2

*Hunt v. Washington State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ...................................................................................................... 28

*Kassel v. Consol. Freightways Corp. of Del.*,
   450 U.S. 662 (1981) ...................................................................................................... 25

*Lexmark Intern., Inc. v. Static Control components, Inc.*,
   572 U.S. 118 (2014) ...................................................................................................... 14

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ........................................................................................................ 9

*N. Am. Meat Inst. v. Becerra*,
   No. 2-19-CV-08569, 2020 WL 919153 (C.D. Cal. Feb. 24, 2020) ......................... 16, 23

*Nat'l Audubon Soc'y, Inc. v. Davis*,
   307 F.3d 835 (9th Cir. 2002) .......................................................................................... 9

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
   682 F.3d 1144 (9th Cir. 2012) ........................................................................... 15, 17, 26

*Nat'l Foreign Trade Council v. Natsios*,
   181 F.3d 38 (1st Cir. 1999) .......................................................................................... 22

*Nat'l Pork Producers Council v. Ross*,
   No. 19-CV-02324 W (AHG), 2020 WL 1984058 (S.D. Cal. Apr. 27, 2020) ................ 27

*Pac. Nw. Venison Producers v. Smitch*,
   20 F.3d 1008 (9th Cir. 1994) ........................................................................................ 26

*Pieczenik v. Comm'r N.J. Dep't of Envt'l Protection,*
715 Fed. App'x 205 (3d Cir. 2017).............................................................................. 12

*Pike v. Bruce Church, Inc.,*
397 U.S. 137 (1970)................................................................................................ *passim*

*Poe v. Ullman,*
367 U.S. 497 (1961).................................................................................................... 10

*Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,*
40 F.3d 1454 (3d Cir. 1994)....................................................................................... 11

*Pustell v. Lynn Public Schools,*
18 F.3d 50 (1st Cir. 1994)........................................................................................... 12

*Rocky Mountain Farmers Union v. Corey,*
730 F.3d 1070 (9th Cir. 2013) .................................................................................... 19

*Rocky Mountain Farmers Union v. Corey,*
913 F.3d 940 (9th Cir. 2019) ...................................................................................... 21

*Safari Club Int'l v. Becerra,*
702 F. App'x 607 (2007) ............................................................................................. 26

*Sam Francis Foundation v. Christies, Inc.,*
784 F.3d 1320 (9th Cir. 2015) ............................................................................... 1, 16

*San Francisco County Democratic Cent. Cmte. v. Eu,*
826 F.2d 814 (9th Cir. 1987) ...................................................................................... 12

*Sellers v. Regents of Univ. of Cal.,*
432 F.2d 493 (9th Cir. 1970) ........................................................................................ 9

*Sharkey v. O'Neal,*
78 F.3d 767 (9th Cir. 2015) .......................................................................................... 8

*South Dakota v. Wayfair,*
138 S. Ct. 2080 (2018)................................................................................................ 27

*UFO Chuting of Hawaii, Inc. v. Smith,*
508 F.3d 1189 (9th Cir. 2007) .................................................................................... 19

*Union Pac. R.R. Co. v. Sacks,*
309 F. Supp. 3d 908 (W.D. Wash. 2018) ................................................................... 11

*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.,*
41 Cal. 4th 929 (2007)................................................................................................ 22

- v -

*White Mountain Apache Tribe v. Williams*,
    810 F.2d 844 (9th Cir. 1985) ............................................................ 11

*Wisconsin Right To Life, Inc. v. Barland*,
    751 F.3d 804 (7th Cir. 2014) ............................................................ 14

*Yakima Valley Memorial Hosp. v. Washington State Dep't of Health*,
    731 F.3d 843 (9th Cir. 2013) ...................................................... 17, 20

**Statutes, Regulations, and Rules**

28 U.S.C. § 2201 ......................................................................................... 9

16 C.F.R. §§ 301.0 *et seq* ....................................................................... 23

Fed. R. Civ. P. 8 ......................................................................................... 8

Fed. R. Civ. P. 12 ....................................................................................... 8

Fed. R. Civ. P. 57 ....................................................................................... 9

Cal. Fish & Game Code § 4000 .............................................................. 3

Cal. Fish & Game Code § 4001 ........................................................... 3, 8

Cal. Fish & Game Code § 4150 .............................................................. 3

S.F. Envt'l Code §§ 2301 *et seq.* ......................................................... 28

S.F. Envt'l Code §§ 2701 *et seq.* ......................................................... 28

S.F. Health Code § 1C.3 ......................................................................... 24

S.F. Health Code §§ 1D *et seq.* .................................................... *passim*

S.F. Park Code § 5.08 .............................................................................. 28

S.F. Police Code § 488 ............................................................................ 28

S.F. Port Code § 4.7 ................................................................................ 28

**Other Authorities**

S.F. Resolution No. 20-08 ....................................................................... 28

- vi -

Chemerinsky, Federal Jurisdiction § 2.4, at 103 (1989) ...................................................... 12

**Constitutional Provisions**

U.S. Const. Art. 1, § 8, cl. 3 ......................................................................................... 16

PLAINTIFF'S COMBINED OPPOSITION TO MOTIONS TO DISMISS — 3:20-cv-00242-RS

**INTRODUCTION AND SUMMARY OF OPPOSITION**

In the spring of 2018, without a word of debate, San Francisco's Board of Supervisors voted, unanimously, to ban the sale, trade, and distribution of virtually all fur products.  S.F. Health Code Art. 1D (the "Fur Ban").  (*See* video of S.F. Board of Supervisors Mtg., Mar. 20, 2018, available at http://sanfrancisco.granicus.com/MediaPlayer.php?view_id=10&clip_id=30068&meta_id=604791.) The Fur Ban went into full effect as of January 1st of this year, and — insofar as there is no farming, commercial trapping, or manufacture of any fur products in San Francisco — it operates so as to block all commerce in fur products from other States and from countries like Denmark and Finland, which are leading producers of mink and fox.  The ban's author explained her motivation for it:  "I just don't believe that we should be profiting on the back of animals, I mean literally."  (*See id*.)

While San Francisco's Board of Supervisors may now share the worldview of animal rights groups like PETA (or like Intervenors), IFF is not challenging the Fur Ban based on its wisdom (or lack thereof) or a mere policy disagreement.  San Francisco remains part of the United States and thus remains subject to the Constitution.  This includes the well-established dormant Commerce Clause "principle [which] ensures that state autonomy over 'local needs' does not inhibit 'the overriding requirement of freedom for the national commerce.'"  *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc), quoting *Great Atl. & Pac. Tea Co.*, 424 U.S. 366, 371 (1976).

Under the Supreme Court's test for determining whether even a facially neutral law violates the Commerce Clause, this Court must deny Defendants' and Intervenors' motions to dismiss IFF's First Amended Complaint (the "FAC").  IFF sufficiently alleges that the substantial burden the Fur Ban imposes on interstate and foreign commerce — a complete closure of San Francisco's market to the tens of millions of dollars of fur products from other States and countries that (until January) were sold each year in San Francisco — is clearly excessive in relation to its putative benefits, which are illusory and, most fundamentally, ***not local***.  Indeed, it is undisputed in this case that there are ***no animals farmed or trapped for their fur in San Francisco***.  Put simply, as alleged in the FAC, the Fur Ban places a dam in the stream of interstate and foreign commerce in products that do not threaten the health, safety, or welfare of a single resident — human or animal — of San Francisco.  Both Defendants' and Intervenors' (largely duplicative) motions must be denied.

If the Court were to dismiss this case at the pleading stage in the belief that San Francisco can constitutionally close its market to all commerce from an industry (e.g., fur) by claiming an interest in the welfare of animals in other states and countries, then wouldn't that mean any city or State could constitutionally close its market to all commerce from *any* industry simply by professing an interest in the welfare of animals — or even of people — outside its jurisdiction, in spite of the resulting burden on "freedom for the national commerce"?  Can anyone say with a straight face that a comparable ban on all commerce in leather products wouldn't impose a "substantial" burden?  Meanwhile, farming fruits and vegetables kills plenty of animals, not to mention the toll it takes on agricultural workers. Fischer, Bob, *Field Deaths in Plant Agriculture*, J. OF AGRIC. & ENVT'L ETHICS (Jun. 2018).  Does that provide a constitutional basis for complete market bans on bananas and broccoli?  This case requires careful consideration (and oral argument, even if only by telephone).  It does not take much to imagine the chaos that would result if every other city and State applied the doctrine of "what's-good-for-goose-is-good-for-the-gander" to close their markets to products or services based on practices they may disapprove of well beyond the limits of their police power.  Fortunately, the United States Supreme Court has long recognized that "the established interdependence of the states only emphasizes the necessity of protecting interstate movement of goods against local burdens and repressions."  *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 538 (1949).

But, first, IFF is entitled to a declaratory judgment that the Fur Ban does not apply to sales of fur products by retailers **outside San Francisco**.  As IFF has alleged, Defendants have flip-flopped on this issue.  The City passed the Fur Ban with the understanding that it does not apply to "out-of-town or online sales."  Once in  effect, however, Defendants publicized their intention to enforce the Fur Ban against retailers outside San Francisco if a fur product is so much as shipped to the City.  Now, in response to this lawsuit, Defendants claim they are not currently enforcing the Fur Ban against retail-ers with no physical presence in the City — but they refuse to definitively disavow such enforcement. Meanwhile, IFF's constituents are losing sales as a result of this uncertainty.  The Court should find this claim justiciable and rule — as Defendants now say they agree — that the Fur Ban does not apply to "fur products that are shipped to persons in San Francisco … from a  seller outside San Francisco." (Defs. Mtn. at 9:12-14.)

# THE RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[2]

## I.     With Arbitrary Exceptions, San Francisco Bans All Commerce in "Fur Products."

### A.     San Francisco Categorically Bans the Sale and Distribution of All Fur Products.

Effective as of January 1, 2020, the Fur Ban has made it "unlawful to sell, offer for sale, display for sale, trade, give, donate, or otherwise distribute a Fur Product by any means in San Francisco." S.F. Health Code § 1D.4.  Under the Fur Ban, a "Fur Product" means "any article of clothing or covering for any part of the body, or any fashion accessory, including but not limited to handbags, shoes, slippers, hats, earmuffs, scarves, shawls, gloves, jewelry, and keychains, that is made in whole or in part of Fur.  'Fur Product' does not include dog or cat fur products." *Id.* § 1D.3.  "Fur" is defined as "any animal skin or part thereof with hair, fleece, or fur fibers attached thereto, either in its raw or processed state." *Id.*

For a law that purports to be about "treating all living beings, humans and animals alike, with kindness," *id.* § 1D.2(i), the Fur Ban sets forth a curious handful of exceptions (not least among them "dog or cat fur products").  "'Fur' does not include such skins or parts thereof as are to be converted into leather, which in processing will have the hair, fleece, or fur fiber completely removed; cowhide with hair attached thereto; or lambskin or sheepskin with fleece attached thereto." *Id.* § 1D.3.

The Fur Ban also allowed the unlimited sale of Fur Products made from furbearing and nongame mammals taken from the wild "under the authority of a trapping license" in California, such as badgers, beavers, otters, and raccoons — even minks and foxes.  Cal. Fish & Game Code § 4000.  On January 1, 2020, however, a statewide ban on the trapping of furbearing and nongame mammals for commerce in fur — and on the sale of their raw fur — took effect.  Cal. Fish & Game Code §§ 4001, 4150.  Accordingly, the Fur Ban now bans Fur Products from all of these animals as well.

### B.     San Francisco Further Threatens to Apply Its Ban Even to Sellers of Fur Products Located *Outside* San Francisco.

#### 1.     The Fur Ban Is Enacted with the Understanding That It Does Not Prohibit Out-of-Town or Online Sales.

---

[2]     The Court will note that this opposition brief includes many of the same points and authorities as set forth in IFF's concurrent Motion for Summary Judgment (Dkt. 35); nevertheless, as required on a motion under Rule 12(b)(6), this brief relies on the allegations in IFF's FAC (Dkt. 25) and on matters properly subject to judicial notice.

When the Fur Ban was first heard in committee, its author requested that the City's own Chief Economist, Dr. Ted Egan, present an analysis of its potential economic impacts.  (*See* video of S.F. Public Safety & Neighborhood Services Cmte. Mtg., Mar. 14, 2018, available at http://sanfrancisco. granicus.com/MediaPlayer.php? view_id= 10&clip_id=30010&meta_id=603303.)  In his presentation on behalf of the City's Office of Economic Analysis, Dr. Egan included the following bullet point under the title "Details of the Proposed Legislation":  "The possession of fur products is not banned; ***nor are out-of-town or online sales explicitly prohibited***.  (*Id*.; FAC ¶¶ 29, 45; *see also* S.F. Board of Supervisors "Board Packet" for Apr. 3, 2018, *Potential Impacts of a Fur Ban*, Ofc. of the Controller (Mar. 14, 2018), at p. 12 of PDF (emphasis added), available at https://sfgov.legistar.com/View.ashx? M=F&ID=6168012&GUID=D11B1C00-3F97-424D-922F-2BDAB67D3431 (emphasis added).)  Later in that same presentation, under the title "Implications," the City's Chief Economist again noted for the committee that "***online and out-of-town purchases are not explicitly subject to the legislation***."  (*Id*. at p. 16 of PDF (emphasis added); FAC ¶¶ 29, 45.)

It is undisputed that, following this presentation, the committee voted unanimously to recommend passage of the Fur Ban by the Board of Supervisors.  As the City's public meeting minutes and videos show, no member of the Board ever questioned this understanding of the Fur Ban's inapplicability to out-of-town or online sales or ever articulated any other interpretation.  The Board unanimously passed the Fur Ban on its first reading on March 20, 2018, and again unanimously passed it (as amended to delay its full effect to January 1, 2020) on a final vote on April 3, 2018.  (FAC ¶ 5.)

2. **Defendant Colfax Threatens to Enforce the Fur Ban Against Retailers Outside San Francisco.**

The Fur Ban charges Defendant Colfax, as Director of the Department of Public Health, with its enforcement.  S.F. Health Code §§ 1D.3, 1D.5(b).  The Fur Ban further authorizes Defendant Colfax to "issue rules, regulations, and guidelines necessary or appropriate for the implementation and enforcement" of the Fur Ban.  *Id*. § 1D.5(a).  At some point after the Fur Ban took effect, San Francisco's Department of Public Health published an online FAQ (i.e., Frequently Asked Questions page) intended to provide guidelines for its enforcement.  (FAC ¶ 43.)

In his FAQ, Defendant Colfax took the position that retailers who are not even located in San

Francisco violate the Fur Ban if anyone uses the Internet (or a telephone) to purchase a Fur Product from them elsewhere in the world and shipped to a recipient in San Francisco.  Answering the question, "Would a retailer that is not physically located in the City violate the Ordinance if a customer purchases a fur product through the retailer's website and the fur product is physically distributed to the City?"  Defendant Colfax stated: "Yes.  Article 1D section 1D.4(a) prohibits the distribution of a fur product by any means in the City.  A retailer that sells a fur product and arranges for a fur product to be distributed to or from the City, violates section 1D.4(a) for distributing a fur product in the City."  (FAC ¶ 43.)  Defendant Colfax apparently took the position that the mere distribution of a fur product through San Francisco "by any means" violates the Fur Ban, such that fur products sold by a retailer *outside* the City may not even be shipped to a recipient in the City.

### 3. In Response to This Lawsuit, Defendant Colfax Now Says He Is Not Enforcing the Fur Ban against Retailers Outside the City — But That He May "Decide in the Future to Pursue Enforcement."

In apparent recognition of the extent of their overreach, at some point *after* IFF filed its original complaint in this action, Defendants attempted to avoid this Court's adjudication of this claim by *changing* the online FAQ above.  (FAC ¶ 47.)  On the same web page, the question and answer quoted above were deleted and replaced with the following:

> Does the Ordinance prohibit the sale of fur products purchased through a retailer's website and physically distributed to a location in San Francisco?
>
> Article 1D section 1D.4(a) prohibits the sale or distribution of a fur product by any means in the City, directly or indirectly, including through a retailer's website. A retailer with a physical location in the City that sells or distributes a fur product to any location, including to an address in the City, violates section 1D.4(a) for selling or distributing a fur product in the City. The Department is not enforcing the ordinance against retailers with no physical presence in the City. If the Department decides in the future to pursue enforcement against retailers with no physical presence in the City, the Department will provide the public with advance notice regarding the Department's change in enforcement policy.

(*Id.*)  Notwithstanding Defendants' position that they are not currently enforcing the Fur Ban against retailers with no physical presence in San Francisco — but that they may decide to pursue enforce-ment at any point — retailers of fur products, such as those of IFF's members, continue to fear prosecution from Defendants, and to lose sales as a result of the Fur Ban.  (*Id.* ¶ 48.)  Moreover, IFF's

members (and its members' members) who sell fur products outside California cannot engage in any meaningful business planning where, at any time upon Defendants' whim (and without any specified period of "advance notice"), Defendants could resume enforcement of the Fur Ban against them.  (*Id.*)

## II.    The Fur Ban Imposes a Complete Embargo on Tens of Millions of Dollars of Fur Products from Other States and Countries.

By its own terms, the Fur Ban imposes a complete market ban on commerce in Fur Products from other States and countries — and it does so to the tune of tens of millions of dollars.  The Fur Ban itself acknowledges the substantial market value of the fur industry — at just the raw pelt stage — in the United States alone.  The Fur Ban notes that "[i]n 2013, approximately 275 mink farms in 23 states across the United States produced about 3 million pelts, with an aggregate value of over $300 million.  As of 2015, mink pelt production in the United States totaled 3.76 million pelts."  S.F. Health Code § 1D.2(d).  According to data from the U.S. Census Bureau's 2012 Economic Census, the category of "Furs and Fur Garments" alone showed $355 million in California sales in 2012 (the most recent year with product category data).  (FAC ¶ 27.)  San Francisco's own Controller recognized that San Francisco likely "accounts for a disproportionate share" of fur products.  (*Id.*)  Even assuming San Francisco's share of fur sales is only proportionate to its share of all retail sales in California (which is a conservative assumption given San Francisco's colder temperatures than the state's other major population centers and its prominence as a shopping destination), San Francisco's Controller estimated — based on data from a census published seven years ago — that its sales of fur were close to $11 million in 2012.  (*Id.*)  According to a more recent survey of retailers by the San Francisco Chamber of Commerce and the Union Square Business Improvement District, the loss caused by the Fur Ban for San Francisco retailers who carry fur clothing alone is estimated to be $45 million a year.  (*Id.* ¶ 26.)

Plaintiff International Fur Trade Federation ("IFF") is an unincorporated association headquartered in the United Kingdom.  (FAC ¶ 15.)  Established in 1949, IFF represents the international fur industry and regulates its practices and trade.  (*Id.*)  IFF promotes the business of fur by establishing certification and traceability programs on animal welfare and the environment.  (*Id.*)  IFF represents 56 members associations in over 40 countries around the world.  (*Id.*)  The members encompass all parts of the fur trade, including farmers, trappers, auction houses, brokers, dressers,

designers, manufacturers, and retailers.  (*Id.*)

IFF's pelt-producing constituents farm or trap animals all over the world, from Wisconsin (home to one America's largest producers of mink), to Finland (a leading producer of fox fur) and Denmark (thae leading producer of mink).  (FAC ¶¶ 16-19, 24.)  IFF's members' pelts are sold from international auction houses such as Kopenhagen Fur, located in Denmark.  (*Id.* ¶ 18.)  The pelts are ultimately manufactured into garments and sold across the U.S. and the world — including, prior to the Fur Ban, in San Francisco.  (*Id.*)  Sales of IFF's members' fur products would immediately resume if the Fur Ban were enjoined.  (*Id.*)

IFF's members whose fur products have been sold in San Francisco face an immediate threat of liability and fines if they sell any of their fur products there today.  (*Id.* ¶¶ 46, 51.)  IFF itself is also suffering injury as an association in the form of a continuing drain on its resources as long as the Fur Ban remains in effect and — apart from the litigation of this action — the association must devote its resources to trying to ascertain and educate its members (and its members' members) as to the scope of the Fur Ban's application to them and to their customers.  (*Id.* ¶ 19.)  Moreover, IFF is suffering a direct economic injury as a result of the Fur Ban because IFF receives and relies on a levy or assessment from each fur pelt sold at the auctions conducted by its members.  (*Id.*)

## III.    No Animals Are Farmed or Trapped for Their Fur in San Francisco.

Though the Fur Ban recites that "[m]ore than 50 million animals" are killed for their fur every year, and that the United States produced 3.76 million mink pelts in 2015, S.F. Health Code § 1D.2(b)-(c), ***there is no dispute that not a single animal is raised or trapped in San Francisco for its fur***.  FAC ¶ 4.

Intervenors even admit that "animals are not farmed or trapped for the purpose of harvesting their fur within the City and County of San Francisco at the present time."  (Dkt. 12-1 (Proposed Answer) at ¶ 4.)  They have also admitted that "no commercial fur farming or trapping businesses operated within the City and County of San Francisco" at the time the Fur Ban was passed in 2018.  (*Id.*)

Indeed, California Assembly Bill 273, which added section 4001 to the Fish and Game Code and took effect on January 1, 2020, has made it "unlawful for any person to trap any fur-bearing mammal for purposes of recreation or commerce in fur" anywhere in California — and further

prohibits the sale in California of the "raw fur of a fur-bearing mammal otherwise lawfully taken pursuant to this code or regulations adopted pursuant to this code." *See* Cal. Fish & Game Code § 4001.  The Senate Floor Analysis for AB 273 even reported that, in terms of fur-bearing animals *trapped in California*, "[c]ollected data suggest that there were *no fur sales in the state* the last 3 years."  Cal. Sen. Rules Cmte., Analysis of AB 273, 2019-20 Reg. Sess., at 4 (Jun. 26, 2019).

* * *

On January 13, 2020, within days after the Fur Ban went into full effect, IFF filed this action challenging the constitutionality of the Fur Ban and seeking declaratory and injunctive relief against its enforcement.  In response to Defendants' original motion to dismiss, IFF filed its FAC (Dkt. 25) as of right on April 13, 2020, to include additional allegations about its standing so as to obviate that issue.

## ARGUMENT

### I.    The Legal Standard on a Motion to Dismiss Requires the Court to Accept IFF's Well-Pleaded Factual Allegations as True and Draw All Reasonable Inferences in IFF's Favor.

A motion to dismiss challenges the legal sufficiency of the claims in the complaint.  Fed. R. Civ. P. 12(b)(6).  A complaint "that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To withstand a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party."  *Sharkey v. O'Neal*, 778 F.3d 767, 768 n.1 (9th Cir. 2015).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.

### II.   IFF Has Sufficiently Alleged a Claim in the First Cause of Action for a Declaratory Judgment That the Fur Ban Does Not Apply to Sales by Retailers Located Outside San Francisco.

#### A.    IFF Satisfies the Legal Standard for Declaratory Relief.

"In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration."  28

U.S.C. § 2201; Fed. R. Civ. P. 57.  While fur products have been fully banned in San Francisco since January, and IFF's constituents are losing sales as they fear enforcement of the Fur Ban (FAC ¶¶ 17, 18, 48), "[t]he dilemma posed by that coercion — putting the challenger to the choice between abandoning his rights or risking prosecution — is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).

Defendants' motion to dismiss IFF's declaratory relief claim rests entirely on their answer to an FAQ — changed only after IFF filed this lawsuit — stating that the they are not currently enforcing the Fur Ban against sales by "retailers with no physical presence in the City," such as online sales. Mot. at pp. 7-12.  Yet this assertion — which is qualified by Defendants' statement that they may well "decide[] in the future to pursue enforcement against" such sales — does nothing to render this action unripe, moot, or otherwise non-justiciable.  *See* Mot. at 9 (citing FAC ¶ 47).  Here, as IFF alleges in the FAC, it is not just their risk of prosecution but the "continuing" financial losses that IFF and its constituents are suffering in the face of the Fur Ban's prohibition and Defendants' shifting enforcement policy.  (FAC ¶¶ 17-19, 48, 51.)  *See National Audubon Society, Inc. v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002) (finding claims justiciable where, facing California ban on sale of furs from animals captured with certain traps, "the core of the trappers' injuries is not a hypothetical risk of prosecution but rather actual, ongoing economic harm resulting from their cessation of trapping").

IFF's members (and its members' members) who sell fur products from outside San Francisco cannot engage in any meaningful business planning where, upon Defendants' mere whim (and without any specified period of "advance notice"), Defendants can resume enforcement of the Fur Ban against them.  (FAC ¶ 48.)  The controversy between IFF and Defendants about the application of the Fur Ban to online and out-of-town sales is thus not "hypothetical," as Defendants argue; it is very much a real one, with IFF and its members in immediate need of a judgment declaring whether they may resume their online and out-of-town sales of fur products shipped to San Francisco without prosecution whenever Defendants may feel like it.  *Cf. Sellers v. Regents of Univ. of Cal.*, 432 F.2d 493, 500 (9th Cir. 1970) (refusing to speculate about plaintiffs' future activity where students failed to allege they would seek to engage in prohibited conduct on campus).

As another district court has explained in a similar circumstance, "Plaintiffs' need for certainty

- 9 -

that Defendant won't prosecute them for selling their foie gras products is understandable — particularly given Defendant's coy reservation of the right to enforce [the statute at issue]." *Ass'n des Eleveurs de Canards et D'Oies du Quebec v. Harris*, 79 F. Supp. 3d 1136, 1143 (C.D. Cal. 2015), rev'd in part and vacated in part on other grounds sub nom. *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140 (9th Cir. 2017).  Defendants cannot avoid an adjudication of this dispute by conveniently claiming — in response to this lawsuit — that they do not currently have sellers of IFF members' Fur Products in their sights.  Defendants would have to definitively disavow any such future prosecution.  "If the prosecutor ***expressly agrees*** not to prosecute, a suit against him for declaratory and injunctive relief is not such an adversary case as will be reviewed here." *Poe v. Ullman*, 367 U.S. 497, 507 (1961) (emphasis added).  This they have not done.

Indeed, despite Defendants' claim that the "[Department of Public Health] has made clear it will not enforce the Fur Products Ordinance against customers using the internet — or other similar means of communication — to 'have a fur product sold elsewhere in the world shipped to him or her … in San Francisco'" (Mot. at 9:9-12), Defendants have ***refused to definitively disavow*** any intention of enforcing the Fur Ban against sellers based outside San Francisco who ship fur products to recipients in San Francisco — let alone stipulate to that effect.  *See* Dkt. 35-14 [Tenenbaum Decl. in Support of IFF's Motion for Summary Judgment] ¶ 6.  Supreme Court precedent thus holds that this remains a justiciable controversy.   In *Babbitt v. United Farm Workers National Union*, the high court identified a justiciable controversy, even though a statute's criminal or administrative penalty provisions have "not yet been applied and may never be applied to commissions of unfair labor practices," in part because the "State ***has not disavowed*** any intention of invoking the criminal penalty provision against unions that commit unfair labor practices."  442 U.S. 289, 301 n.13 302 (1979) (emphasis added).

Notably, not a single one of Defendants' cited authorities involves a government official (or body) who expressly reserved the right to enforce a challenged statute against the plaintiff seeking declaratory relief.  And that is only one key point on which the cases Defendants cite are readily distinguished from ours.  For example, in its two-paragraph opinion in *Citizens for Honesty & Integrity in Reg'l Planning v. Cty. of San Diego*, 399 F.3d 1067, 1068 (9th Cir. 2005), the Ninth

- 10 -

Circuit — reviewing a factual record following summary judgment — observed that "there is no threat of prosecution, imminent *or otherwise*, or evidence that the County intends to employ the local definition" against the plaintiff.  The district court's opinion in that case reveals the key differentiating facts:  after receiving his application for a permit to develop his property, the government defendant had written the plaintiff a letter stating its "promised recommendation" to adopt his interpretation and then "made no attempt to enforce the [challenged ordinance] against [the plaintiff] while his aforementioned application was pending *for more than eight years*."  *Citizens for Honesty & Integrity in Reg'l Planning v. Cty. of San Diego,* 258 F. Supp. 2d 132, 1134 (S.D. Cal. 2003) (emphasis added). In our case, Defendants have made no such promise to IFF, and it has been only a few months since they posted their updated FAQ response.

Defendants' reliance on *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 856 (9th Cir. 1985), as somehow comparable to "the[] circumstances" in our case is almost silly, since the reason the government "made clear" in that case that it did not intend to impose any of the disputed taxes on the plaintiff was because an intervening United States Supreme Court decision found the tax to be preempted and "barred it from doing so," and the government even "filed an affidavit" with the Court stating its intention not to impose the taxes.  *Id*. at 855-56 (finding "no basis for presuming from this record that the Arizona officials will not honor a final state court judgment based upon a decision of the United States Supreme Court" and finding any other attempt to impose such taxes "thwarted by the doctrine of collateral estoppel"); *cf. Union Pac. R.R. Co. v. Sacks*, 309 F. Supp. 3d 908, 919 (W.D. Wash. 2018) (finding sufficient disavowal in form of court declaration filed by government department's program manager stating that, unless final appellate court decision finds no preemption, department "will not enforce its break rule … against any interstate railroad").  Could that case be any less similar to ours at this stage?

The other cases Defendants cite on this point — all from outside the Ninth Circuit, and with cherry-picked phrases that say nothing about the predicate facts — are so different as to lack even persuasive value here.  *See Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463, 1471 (3d Cir. 1994) (citing *affidavit* from director of government department setting forth official position, submitted at summary judgment, that stated it has "no intention to prosecute" and

- 11 -

"would not even attempt to enforce" statute against church or its official — without any reservation of right to pursue enforcement "in the future"); *see also Pieczenik v. Comm'r N.J. Dep't of Envt'l Protection*, 715 Fed. App'x 205, 208 (3d Cir. 2017) (explaining that government defendants "have expressly stated" — to the court — "that they have *never* planned to, and *never will*, take action against" plaintiff under consent order to which plaintiff was not a party because "they agree that they *cannot*") (emphasis added).  Indeed, the *Presbytery of N.J.* case recognized that "it is well established that a case is ripe because of the substantial hardship to denying preenforcement review when a person is forced to choose between forgoing possibly lawful activity and risking substantial sanctions." *Id*. at 1468 (quoting Chemerinsky, Federal Jurisdiction § 2.4, at 103 (1989).  And Defendants apparently did not read the rest of the opinion in *Pustell v. Lynn Public Schools*, 18 F.3d 50, 52-53 (1st Cir. 1994), or they would not have cited it as they did, since the First Circuit actually found the claims justiciable "[r]egardless of the imminence of an enforcement action," since the plaintiffs "will continue to suffer the harm of substantial uncertainty if we put off resolving their constitutional claims" and "are entitled to know whether they may continue to school their child at home without risking sanctions" (citations omitted).  Given Defendants' refusal to make legally binding the enforcement position they take in their motion, IFF's members' fear of prosecution under the Fur Ban — and the imposition of up to a $1,000 per violation, without any limitation — is not unreasonable.

Defendants also argue that declaratory relief is inappropriate because they have never actually enforced the Fur Ban against any of IFF's members' products.  (Mot. at 11:3-6 ("[E]ven if the mootness doctrine did play some role in this case, voluntary cessation would not apply because San Francisco never ceased engaging in any challenged conduct.")) In the first place, the Fur Ban has only been in full effect for a matter of months, so claiming a history of non-enforcement (without any evidentiary support) during this brief time does not mean much.  Moreover, IFF has alleged that out-of-state sellers of fur products are complying with the Fur Ban and facing lost sales rather than "commonly and notoriously" violating the law and facing potentially unlimited fines (FAC ¶ 48; S.F. Health Code § 1D.5(b)(5)), which was the basis for the Ninth Circuit's rejection of the "never-been-enforced" argument in *San Francisco County Democratic Cent. Cmte. v. Eu*, 826 F.2d 814, 821-22 (9th Cir. 1987).  So this argument provides no basis for dismissal either.

Although Defendants' motion to dismiss never actually argues that IFF's claims are either "unripe" or "moot" — their primary argument being that they no longer disagree with IFF's interpretation of the Fur Ban — at least one case from this Court is instructive. In *Alfaro-Orellana v. Ilchert*, 720 F. Supp. 792, 793 (N.D. Cal. 1989), another judge of this Court rejected the government's claim of mootness to a claim seeking interpretation of regulations concerning authorizations of aliens to work in the United States. While the government had asserted that "it is not now" its "current normal practice" to revoke employment authorization, the court noted that this statement was "made after the litigation started" and was "somewhat equivocal" — just like Defendant Colfax's statement, made only after this case was filed, that he "is not enforcing" the Fur Ban against out-of-town retailers but will provide notice "[i]f the Department decides in the future to pursue enforcement." *Id*. at 794; *see also Green Party of Tennessee v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015) ("While defendants have not enforced or threatened to enforce this statute against plaintiffs or any other political party, they also have not explicitly disavowed enforcing it in the future. In such situations, the Supreme Court has held that plaintiffs have standing to challenge statutes.").

The FAC includes the straightforward allegations that "IFF members now face prosecution by Defendants when their products are shipped to persons in San Francisco, even after title has passed from a seller outside San Francisco" (FAC ¶ 46) and that retailers of IFF's members' fur products "continue to fear prosecution from Defendants, and IFF and its members (and its members' members) continue to lose sales as a result of San Francisco's having made their fur products unlawful for sale even outside San Francisco (or California) if shipped to persons in California" (FAC ¶ 48). Defendants argue that declaratory relief is inappropriate because IFF's members merely "subjectively" fear prosecution from Defendants for shipping their fur products to recipients in San Francisco. *See* Mot. at 11. But it is not "subjective" to fear prosecution under the Fur Ban where Defendants have already stated that "[a] retailer that sells a fur product and arranges for a fur product to be distributed to or from the City, violates section 1D.4(a) for distributing a fur product in the City," and then reversed this stance only in response to this lawsuit, while reserving the right to reverse their stance at any point in the future and prosecute precisely these sales. *See* FAC ¶¶ 43, 47-48.

Defendants cannot treat enforcement of the Fur Ban as a game of "Red Light, Green Light." Indeed, at least one court of appeals has recognized that such shifting positions cannot satisfy a defendant's "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." In *Wisconsin Right To Life, Inc. v. Barland*, the court noted explained that, even though the government's counsel had advised the court that it "will not enforce the statute" against the plaintiff because it conceded that it was unconstitutional, the government's "inconsistent and shifting positions do not give us much confidence that it will not enforce the statute" and that "[b]y not ***fully disclaiming the right to enforce*** this facially invalid statute, the Board's halfhearted concession leaves us with no assurance that it will continue to recognized its unconstitutionality." 751 F.3d 804, 831-32 (7th Cir. 2014) (emphasis added).

"[A] federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Intern., Inc. v. Static Control components, Inc.*, 572 U.S. 118, 126 (2014) (citations and quotations omitted). If Defendants wish to avoid an adjudication of IFF's declaratory relief claim on the basis of their assertion that "there is no dispute between the parties about the Ordinance's scope" (Mot. at 7:15), then the Court should invite them to enter into a stipulated judgment reflecting what they say is the parties' agreed interpretation of the Fur Ban's inapplicability to sellers outside San Francisco. Otherwise, without a definitive disavowal of their prior enforcement policy, the motions to dismiss IFF's claim for declaratory relief must be denied. [3]

## B.     The Court Should Declare In Its Judgment that the Fur Ban Does Not Apply to Sales by Retailers Located Outside San Francisco.

Defendants notably do not challenge IFF's claim for declaratory relief on its merits — because they claim to now agree with IFF about the Fur Ban's scope. Rather, the sole basis for Defendants' motion to dismiss this claim is that IFF is "not entitled to a declaratory judgment because there is no dispute between the parties about the ordinance's meaning." (Mot. at 7:7-8.) Accordingly, if the

---

[3]     Intervenors' motion to dismiss does not even address IFF's First Cause of Action for declaratory relief; instead, their motion says they "adopt and incorporate by reference" Defendants' argument on this claim — which must be read to mean, as Defendants themselves state, "[t]here is consequently no disagreement between the parties about whether the Ordinance applies to 'products that are shipped to persons in San Francisco … from a seller outside San Francisco.'" (Defs. Mtn. at 9:12-14 [ellipsis in original].) *See* Dkt. 33 [Int. Mtn.] at p. 4, n.2.

Court finds this claim justiciable (as it should, for the reasons above), then Defendants' motion must

be denied, and — given Defendants' claim that they do not dispute IFF's interpretation of the Fur Ban

as inapplicable to fur products shipped to San Francisco from a seller based outside the City — the

Court should proceed to grant IFF's pending cross-motion for summary judgment (Dkt. 35).

In light of their having since modified their policy "to resolve uncertainties about [their]

interpretation of the Ordinance," Defendants' motion states unequivocally:  "There is consequently no

disagreement between the parties about whether the Ordinance applies to 'products that are shipped to

persons in San Francisco . . . from a seller outside San Francisco.'"  (Mot. at 9:12-14 (ellipsis in

original), citing FAC ¶ 52.)  Indeed, if, as Defendants say, "there is no dispute between the parties

about the Ordinance's scope," then the Court should enter judgment in accordance with what

Defendants now say is an agreed interpretation of the Fur Ban.  To make its judgment unassailable on

appeal, the Court's declaratory judgment can simply quote from *Defendants'* brief and declare:

> Defendants shall not enforce Article 1D of the San Francisco Health Code
> "against retailers with no physical presence in the City [and County of San
> Francisco]."  For the avoidance of doubt, "when a person or entity purchases a fur
> product over the [I]nternet — or through a similar means of communication —
> from a retailer based outside the City," Defendants shall "not enforce [Article 1D]
> against them or the retailer itself, even if the fur product is shipped to a San
> Francisco address."

(Defs. Mtn. at 8:13-16.)

### III.  IFF Sufficiently Alleges Its Causes of Action Asserting That the Fur Ban Violates the Dormant Commerce Clause Because the Fur Ban Imposes a Substantial Burden on Interstate and Foreign Commerce that Clearly Exceeds Any "Putative Local Benefits."

While Defendants claim that IFF is "confuse[d]" about what constitutes a substantial burden on

interstate commerce (Def. Mtn. 19:4-5), and Intervenors claim that IFF "misunderstand[s]" the

"purpose and role the dormant Commerce clause plays in protecting interstate commerce (Int. Mtn.

7:23-24), the very authorities they cite show that — as IFF maintains — the Commerce Clause

protects "the interstate market" and "the interstate flow of goods" from prohibitions such as the Fur

Ban.  *Exxon Corp. v Governor of Md.*, 437 U.S. 117, 127-28 (1978); *Nat'l Ass'n of Optometrists &*

*Opticians v. Harris*, 682 F.3d 1144, 1154 n.14 (9th Cir. 2012).  Here, IFF has alleged precisely the

nature and extent of the burdens on commerce that the Supreme Court and Ninth Circuit have recog-

- 15 -

nized as impermissible under the Commerce Clause.  This Court should similarly uphold the "principle [which] ensures that state autonomy over 'local needs' does not inhibit 'the ***overriding requirement*** of freedom for the national commerce.'"  *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc), quoting *Great Atl. & Pac. Tea Co.*, 424 U.S. 366, 371 (1976) (emphasis added).

And, while IFF condemns cruelty to animals anywhere and agrees that the prevention of animal cruelty is a legitimate governmental interest, the Supreme Court has never held that a State (or city) may close its market to the rest of the Nation based on its perception of the treatment of animals — or of human beings, for that matter — in *other* jurisdictions.  Its precedents intone against such a notion.  Even in the very recent pork case Defendants cite, *N. Am. Meat Inst. v. Becerra* — which involved a statute that did not even ban all pork — the district court went on to recognize at the motion to dismiss stage the exact argument IFF makes here:  that the allegation that "California has no legitimate local interest in farming conditions in other states" sufficiently pleads "the absence of any benefits that would justify the [statute's] alleged burden on interstate commerce."  No. 2-19-CV-08569, 2020 WL 919153, at *8 (C.D. Cal. Feb. 24, 2020).  The Court should reach the same conclusion here and deny the motions to dismiss IFF's dormant Commerce Clause claims.

> **A.**     **Under the Legal Standard Established in *Pike v. Bruce Church, Inc.*, IFF Need Only Plead that the Fur Ban Imposes a Substantially Burden on Interstate or Foreign Commerce That Is Clearly Excessive in Relation to Any "Legitimate Local Purpose."**

The Commerce Clause of the United States Constitution empowers Congress "to regulate commerce with foreign nations, and among the several states[.]"  U.S. Const. Art. 1, § 8, cl. 3. Implicit from this express grant of power to Congress is a limitation on states' and cities' authority to enact laws that burden interstate and foreign commerce, which limitation is known as the dormant Commerce Clause doctrine.  While lower courts have ascribed various purposes to the Commerce Clause, the Supreme Court has repeatedly emphasized that "[t]he ***very purpose*** of the Commerce Clause was to create an area of free trade among the several States."  *Great Atl. & Pac. Tea Co.*, 424 U.S. at 370 (emphasis added; quotation and citation omitted).  As the Supreme Court has also described it, the Commerce Clause "by its own force created an area of trade free from interference by

the States." *Id.* (quotation and citation omitted).

The Supreme Court's test for whether a state or local statute that impacts interstate commerce violates the Dormant Commerce Clause doctrine is as follows:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Yakima Valley Memorial Hosp. v. Washington State Dep't of Health*, 731 F.3d 843, 846 (9th Cir. 2013) (emphasis added), *citing Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In other words, under *Pike*, even "where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental," it will ***not*** be upheld if "the burden imposed on such commerce is ***clearly excessive*** in relation to the putative local benefits." *Pike*, 397 U.S. 137 at 142 (emphasis added). This is sometimes referred to as *Pike* balancing — a test the Fur Ban flunks in this case, as sufficiently alleged by IFF.[4]

## B. The Fur Ban Does Far More Than "Substantially" Burden Interstate and Foreign Commerce in Fur Products.

While *Pike* requires only "incidental" effects on interstate commerce to trigger its balancing test, the Ninth Circuit has engrafted upon it a prerequisite that the burden on commerce be "signifi-cant" or "substantial." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (using both adjectives interchangeably). IFF has easily alleged that here. Because the Fur Ban effectuates a ***complete*** market ban on ***all commerce*** in Fur Products between San Francisco and other States and countries, the Fur Ban imposes the most substantial possible burden of all.[5]

---

[4]    Defendants apparently misunderstand IFF's Commerce Clause claims. IFF does not allege that the Fur Ban is discriminatory or has the practical effect of regulating its constituents' conduct extraterritorially. That is because, no matter how well any fur farmer may treat his animals, the Fur Ban operates as a categorical ban on commerce in products made from their fur. So Movants' pages of argument about discrimination or extraterritorial regulation are irrelevant to this case.

[5]    The Ninth Circuit (and other courts) typically evaluate the extent of the burden a statute imposes on commerce *before* they examine its putative local benefits. Read carefully, however, *Pike*

Indeed, it is hard to imagine legislation that would more substantially burden commerce in the market for a category of goods than a categorical ban on the sale and distribution of such goods. (Intervenors' argument that IFF makes "no sufficient allegation that the fur ban imposes **any** burden on interstate commerce, let alone the substantial burden required," Int. Mot. 7:19-20 (emphasis in original), reflects a distorted perspective of what IFF has alleged. *See* FAC ¶¶ 9, 26-30.)  For example, a tax of 50% would place a major burden on commerce in any product, but, as substantial as that would be, it pales in comparison to a ***total prohibition*** of all Fur Products.  To conclude that San Francisco can close its market to ***all*** interstate and foreign commerce in Fur Products and yet somehow not substantially burden such commerce would be to ignore economic reality and the very underpinnings of the Commerce Clause.  As the Ninth Circuit has recently reiterated, the dormant Commerce Clause ensures that States do not inhibit "the overriding requirement of freedom for the national commerce."  *Sam Francis Found.*, 784 F.3d at 1323 (citation omitted).

Here, the dollar volume of lost commerce only further shows that the burden is substantial. The City's own estimate of the size of the market for Fur Products was nearly $11 million as of 2012. *See* FAC ¶ 27.  And the City cited a survey by the San Francisco Chamber of Commerce that showed the market for fur products in San Francisco to be approximately $40 million (in 2017), a difference the City's Office of the Controller acknowledged could be explained by the fact that San Francisco "likely" accounts for a disproportionate share of retail sales of fur products. *Id.* ¶¶ 26-27.  According to the City's own reference to data from the U.S. Census Bureau's 2012 Economic Census, the category of "Furs and Fur Garments" alone consisted of $355 million in sales in California in 2012. *Id.* ¶ 27.  It should be remembered that, in *Pike*, a $200,000 one-time expense for a single business to

---

actually requires balancing only where the statute at issue "regulates evenhandedly to effectuate a legitimate local public interest" in the first place.  *Pike*, 397 U.S. at 142.  Where a statute does so, and where "its effects on interstate commerce are only incidental," then it is upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Id*.  But the question of "degree," i.e., "the extent of the burden that will be tolerated," only comes into play "[i]f a legitimate local purpose is found" in the first place.  *Id*.  Thus, under a more faithful reading of *Pike*, a court should first ascertain whether the Fur Ban even has a "legitimate local purpose" (something that should ordinarily be easy to find — except here) before determining "the extent of the burden that will be tolerated" in relation to it.  Here, as IFF's Second Cause of Action alleges, the Fur Ban substantially burdens commerce *without* a cognizable legitimate local purpose.  (FAC ¶¶ 53-62.)

pack cantaloupes in Arizona was recognized as an undue burden on commerce.  *Pike*, 397 U.S. 137 at

146.  And there was certainly nothing "inherently national" or requiring a "uniform system of

regulation" about the cantaloupes in *Pike*.  Nor, in the decades since, has the Supreme Court ever

articulated any such requirement as Movants ask this Court to now impose on IFF's claim.

Instead of arguing over the extent of the burden on commerce (a fight they cannot win),

Defendants argue that a ban that does not discriminate between in-state and out-of-state interests

cannot be substantial.  *See* Mot. at 17.  But that makes no sense in light of the Supreme Court's clear

instructions in *Pike*, which require a court to engage in balancing of the burdens on commerce with a

statute's putative local benefits in cases "[w]here the statute regulates evenhandedly."  *Pike*, 397 U.S.

at 142; *UFO Chuting of Hawaii, Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir. 2007) ("A *facially*

*neutral* statute may violate the Commerce Clause if the burdens of the statute ... so outweigh the

putative benefits as to make the statute unreasonable or irrational.") (emphasis added).  Indeed, in

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1078 (9th Cir. 2013), the Ninth Circuit

remanded for the district court to consider whether the regulations at issue discriminate "in purpose or

in practical effect" and — "*if not*" — then to "apply the balancing test established in *Pike*."

Defendants also cite the Ninth Circuit's opinion in *Ass'n des Eleveurs de Canards et d'Oies du*

*Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013), in support of their argument that the Fur Ban "does

not substantially burden interstate commerce even by imposing a total ban on the sale or distribution

of fur products in San Francisco."  *See* Mot. at 17.  But that case is readily distinguished from ours.  In

*Ass'n des Eleveurs*, the Ninth Circuit was reviewing a preliminary injunction ruling in a case involving

a ban on poultry liver products that result from force feeding birds.  The panel found no substantial

burden because the district court had said that the loss of over $5 million dollars in sales of the

plaintiffs' multiple duck products "overestimate[d]" the impact on commerce and  because it included

products that were "not covered by" the ban.  729 F.3d at 952.  Most fatal to Movants' argument that

*Eleveurs* somehow upholds "total bans" on products like foie gras or fur is that the Ninth Circuit

expressly noted that "[a]t this stage in the proceedings, Plaintiffs **have not shown** that the effect of [the

statute at issue] is **complete import and sales ban** on foie gras."  *Id*. at 949-50 (emphasis added).  So

*Eleveurs* does not stand for what Movants say it does.  At any rate, if a complete ban on all products

- 19 -

from other States and countries in an industry such as fur does not substantially burden interstate and foreign commerce in a way that limits free trade, it is hard to conceive of a restriction on commerce that does.

IFF has sufficiently alleged that San Francisco's complete market ban on Fur Products from all other States and countries imposes a "substantial" burden on interstate and foreign commerce.

## C.   The Putative Purposes Set Forth in the Fur Ban Are Neither "Local" Nor "Legitimate."

As a definitional matter, in balancing the burden on commerce with any "legitimate local public interest," *Pike* requires a court to consider the question "of degree" only "[i]f a legitimate local purpose is found" in the first place. *Pike*, 397 U.S. at 142.  *Pike* thus requires this Court to determine that the Fur Ban serves a purpose that is both *local* and *legitimate*.  As IFF has alleged, the purported benefits of the Fur Ban are "illusory or nonexistent" — and are unquestionably not *local*.  *Yakima Valley Mem'l Hosp.*, 731 F.3d at 849.

Even viewing the Fur Ban's stated purposes with respect for the genuineness of its intentions, the Fur Ban does not advance any legitimate local purpose.  The Fur Ban justifies a categorical ban on fur based on the following litany of assertions:

- "[F]ur is less of a necessity and more of a luxury."  *Id.* § 1D.2(a).

- "Fur garments are now typically designed for fashion rather than warmth."  *Id.*

- "[M]ore animals are now killed to make decorative fur trim than to manufacture full fur garments."  *Id.*

- "More than 50 million animals are violently killed for their fur every year," and "[m]ajor producers of fur include the United States, Canada, and Scandinavian countries."  *Id.* § 1D.2(b).

- "More than 85% of pelts in the world's fur trade come from fur farms," most commonly "mink, fox, marten, and chinchilla."  *Id.* § 1D.2(c).

- "The majority of pelts produced annually are mink.  In 2013, approximately 275 mink farms in 23 states across the United States produced about 3 million pelts, with an aggregate value of over $300 million."  *Id.* § 1D.2(d).

- "Fur farming can be damaging to the environment and contributes to water and air pollution."  *Id.* § 1D.2(e).

- "Fur processing often involves the use of harmful chemicals including chromium and formaldehyde."  *Id.*

- Fur farming "consumes significant quantities of energy."  A fur coat requires "over 15

- 20 -

times" the energy of a fake fur garment. "For each kilogram of factory-farmed mink fur, 110 kilograms of carbon dioxide is produced." *Id.* § 1D.2(f).

- "Existing laws require relatively little oversight of the fur farming and fur trade industries. Compliance with guidelines issued by the American Veterinary Medical Association is not mandatory, and fur farms are not monitored by any government agency." *Id.* § 1D.2(g).

- "The sale of fur products in San Francisco is inconsistent with the City's ethos of treating all living beings, humans and animals alike, with kindness. In light of the wide array of faux fur and other alternatives for fashion and apparel, the demand for fur products does not justify the unnecessary killing and cruel treatment of animals. Eliminating the sale of fur products in San Francisco will promote community awareness of animal welfare, bolster the City's stance against animal cruelty, and, in turn, foster a more humane environment in San Francisco." *Id.* § 1D.2(i).

S.F. Health Code § 1D.2 ("Findings and Purpose"). This is the proverbial spaghetti thrown on the wall in the hope that something will stick. Here, a careful examination of this list reveals that the Fur Ban is not justified by any "legitimate local interest." Indeed, Movants do not even pretend that the Fur Ban was enacted to protect any animals (or people) or the environment *in San Francisco*. *See* Mot. at 21. Instead, Defendants admit that the Fur Ban "was enacted to conserve and protect populations of fur-producing animals *in the United States and elsewhere*." *Id.* (emphasis added).

### 1.   The Putative Purpose Referring to Animal Welfare Is Certainly Not "Local."

IFF, which represents an industry that works with animals under some of the strictest animal welfare conditions in the world, *see* FAC ¶ 10, wholeheartedly agrees that "protecting wildlife and the environment, preventing animal cruelty, and enhancing animal welfare are legitimate state interests." *See* Mot. at 21. However, Ninth Circuit case law holds that a state may regulate in a manner that burdens interstate commerce to address "*local* harms," *Rocky Mountain Farmers Union*, 730 F.3d at 1103-04 (emphasis added), or "minimize the *in-state* harm caused by products sold in-state," *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 952-53 (9th Cir. 2019) ("*Rocky Mountain II*") (emphasis added) (disclaiming California's interest in limiting sale of certain fuels merely because "it thinks that it is the state that knows how best to protect Iowa's farms, Maine's fisheries, or Michigan's lakes"). Here, no *local* interest in preventing the "unnecessary killing" of animals, promoting a "more humane environment," or treating living beings with "kindness" is served by the Fur Ban because no animals are farmed or trapped for their fur *in San Francisco*. *See* FAC ¶¶ 4, 58-59.

Given the prerequisite that any burden on interstate or foreign commerce be the result of addressing a **local** harm, the Court's inquiry should stop here: the Fur Ban fails the test in *Pike* as most recently upheld by the Ninth Circuit in the *Rocky Mountain* cases. *See Pike*, 397 U.S. at 142. Defendants rely on *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1139 (9th Cir. 2015), *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 553 (7th Cir. 2007), and *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 336 (5th Cir. 2007), for the proposition that "[s]tates and local governments may target a harmful practice that occurs elsewhere by reducing the local market for the fruits of that practice." *See* Mot. at 21-22.  But none of those cases involved practices that only "occur[ed] elsewhere," as taking sharks from California waters and slaughtering horses in Illinois and Texas occurred in the very jurisdictions that enacted the bans in those cases.  The holdings in these cases (myopically reasoned as they are) are thus inapplicable here, where the farming and trapping of animals for their fur takes place entirely outside of San Francisco (and even outside California).  Defendants' citation to *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 934 (2007), is particularly inapposite because that case did not involve *Pike* balancing at all.  *See* Mot. at 22.

Supreme Court precedent supports IFF on this point.  In *Edgar v. MITE Corp.*, 457 U.S. 624, 642 (1982), an Illinois law placed certain requirements on tender offers made to shareholders of corporations that either were organized in Illinois, had their principal executive office in Illinois, or had at least 10% of their stated capital and paid-in surplus represented in Illinois.  An out-of-state offeror challenged the law under *Pike*, and the Illinois Secretary of State tried to defend it on the grounds that it served two seemingly legitimate local interests:  protecting resident shareholders and regulating the internal affairs of Illinois companies.  *Id*. at 644.

The Supreme Court plurality rejected this: "While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders." *Id*.; *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 93 (1987) ("Indiana has no interest in protecting nonresident shareholders of nonresident corporations."); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 70-71 (1st Cir. 1999) (footnote omitted), aff'd sub nom. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (noting that Supreme Court "has not suggested that moral

- 22 -

concerns regarding human rights conditions abroad" are valid state concern and holding that claim of "local purpose" for Massachusetts law disfavoring goods from Burma "is very weak and does not suffice").  If, as the Supreme Court has held, protecting nonresident *human rights* is not to be considered a legitimate interest for *Pike* balancing, then, a fortiori, San Francisco's purporting to protect nonresident animals is not either.  Indeed, the Supreme Court has never held that protecting extraterritorial animals or environments, reducing local market demand for a condemned item, or avoiding being "complicit" in the destruction of animals or the environment are legitimate local interests.  *See* Def. Mot. at 22 (citing *Cresenzi Bird Importers, Inc. v. State of N.Y.*, 658 F. Supp. 1441, 1447 (S.D.N.Y. 1987); Int. Mot. at 14.  (And *Cresenzi* concerned "wild" animals, not farmed ones.)

Like the district court in *N. Am. Meat Inst. v. Becerra* ruled just months ago — denying the state's motion to dismiss a challenge to a statute limiting the sale of pork based on how pigs are raised outside California because "California has no legitimate local interest in farming conditions in other states" — this Court should conclude that IFF's similar allegations are sufficient at this stage of the case.  No. 2-19-CV-08569, 2020 WL 919153, at *8 (C.D. Cal. Feb. 24, 2020).

### a.   The Putative Purpose Referring to Animal Welfare Is Also Not Even Legitimate as to Fur from IFF's Members.

Even if the existence of furbearing animals raised in Wisconsin, Finland, or Denmark were somehow considered a valid *local* interest within the police power of San Francisco — and, unless words have no meaning, it can't be — it would not be a legitimate one with respect to Fur Products from the pelts of animals farmed or trapped in the States and countries where most fur comes from.  In the first place, the federal Fur Products Labeling Act, 15 U.S.C. §§ 69, and the Federal Trade Commission regulations enacted thereunder, 16 C.F.R. §§ 301.0 *et seq.*, include thorough require-ments for the labeling of every "article of wearing apparel made in whole or in part of fur," including its country of origin, so consumers can know where the fur in the clothes they buy comes from.  15 U.S.C. §§ 69(d), 69b(2).  As an example, Wisconsin is home to one of the largest producers of mink pelts in the United States.  (FAC ¶ 17.)  It of course has a prohibition on "mistreating animals" that makes it unlawful for a person to "treat any animal, whether belonging to the person or another, in a cruel manner," and it defines "cruel" to mean causing "unnecessary and excessive pain or suffering or

unjustifiable injury or death."  Wisc. Stat. §  941.02.  *See also* FAC ¶ 10 (alleging that IFF's farming members' animals are raised under some of the strictest animal welfare conditions in the world).  For instance, the Danish fur breeders who own Kopenhagen Fur are strong advocates of animal welfare and go to great lengths to ensure the health and well-being of their animals.  *Id.* ¶ 18.  The concerned voters and officials of the jurisdictions in which these animals are actually raised, killed, and processed have determined that there is no animal cruelty involved.  *Id.* ¶ 58.  San Francisco's ban on all Fur Products from these foreign jurisdictions — passed without any regard for the existing animal welfare standards in any of these places — has no legitimacy in light of the animal protection measures put in place by the governments actually responsible for the welfare of their own animals.

San Francisco's claim that a ban on the sale of fur products somehow reflects its superior interest in protecting animals from being farmed or trapped for their fur is especially questionable given that San Francisco ***does not even prohibit fur farming within its own borders*** (and only bans trapping of furbearing animals in a park or with the use of a steel-jawed leg-hold trap**).**  S.F. Park Code § 5.08; S.F. Port Code § 4.7; S.F. Police Code § 488.  As the Supreme Court observed in *Edgar*, a claimed legislative interest is illusory where the government "completely exempts from coverage" a whole class of similar activity within its own jurisdiction.  457 U.S. at 644 (noting that imposing requirements on tender offers while exempting corporation's offer to acquire its own shares "is at variance with Illinois' asserted legislative purpose, and tends to undermine [its] justification for the burdens the statute imposes on interstate commerce").  As another example of its irrationality, the Fur Ban prohibits the sale of finished fur products made from dead rabbits from other States and countries, but the same codebook allows live rabbits to be sold ***in San Francisco*** to be raised for human carnivores.  S.F. Heath Code § 1C.3(b).

### 2.    The Putative Purposes Referring to the Environment, Energy Consumption, and Chemicals Are Certainly Not "Local."

Like its incantation about animal welfare, the Fur Ban's putative purpose of protecting the environment is wholly untethered to any activity in San Francisco.  *See C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 393 (1994) ("States and localities may not attach restrictions to exports or imports in order to control commerce in other States.").  San Francisco's purported interest

in prohibiting fur based on the claim that fur farming "can be damaging to the environment," "consumes significant quantities of energy," and produces "carbon dioxide," or that fur processing "often involves use of harmful chemicals including chromium and formaldehyde," is neither local nor legitimate as applied to IFF's fur products because ***no fur products are manufactured, processed, or otherwise made in San Francisco***.  *See* FAC ¶¶ 4, 58-59.  San Francisco's waters are not even touched (let alone contaminated), its air is not even exhaled (let alone polluted), and its environment is not degraded *at all* by the farming and processing of fur products in Wisconsin, Finland, Denmark, or anywhere else in the world.  So these cannot be legitimate ***local*** interests in this case.

> ### a.     The Putative Purposes Referring to the Environment, Energy Consumption, and Chemicals Are Also Illusory, Irrational, and Pretextual as to Fur from IFF's Members.

As the Supreme Court has explained, the mere "incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack."  *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (plurality).  "Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause."  *Id*.  Apart from San Francisco's purported environmental concerns being decidedly not local, they are also not legitimate.  As one example of how illusory the "environmental" interests are, so-called "faux fur" — which the Fur Ban urges as an alternative to natural fur, *see* S.F. Health Code § 1D.2(i) — is made from fossil fuels (i.e., petroleum), not exactly a favorite among most environmentalists.  *See, e.g.*, Vanessa Friedman, *The California Fur Ban and What It Means for You*, New York Times (Oct. 14, 2019), available at https://www.nytimes.com/2019/10/14/style/fur-ban-california.html (noting that "fake alternatives are made from petroleum and other plastic-based synthetics and are generally regarded as entirely disposable, which means they end up in landfill, which means fake fur is probably worse for the environment than real fur, which is almost never thrown away.").

While San Francisco purports to be concerned about "harmful" levels of chromium and formaldehyde involved in fur processing, San Francisco itself does not even have any regulations regarding the use of these common chemicals ***within San Francisco***.  Indeed, San Francisco does not even ban any other product on the basis that its production involves — or that it even contains —

chromium or formaldehyde, such as permanent press clothing.  *See* https://www.p65warnings.ca.gov/
fact-sheets/formaldehyde.  In any event, merely mentioning an omnipresent chemical does not provide
a legitimate legislative purpose for banning all fur products.  The pretextual nature of San Francisco's
environmental justifications for the Fur Ban should be plain.

### D.   The Fur Ban's Complete Ban on All Interstate and Foreign Commerce in Fur Products Clearly Exceeds Any Putative Local Benefits.

Defendants wrongly claim that "Plaintiff's *Pike*-related causes of action all fail at the threshold
because IFF is not entitled to balancing under *Pike*.  *Pike* balancing only comes into play after a
plaintiff has first shown a substantial burden on interstate commerce."  *See* Def. Mot. at 16.  Notably,
Defendants do not cite *Pike* for this proposition.  Defendants argue that IFF has not shown that the Fur
Ban substantially burdens commerce because IFF neither "(1) … show[s] that the law is discrimina-
tory, or (2) … demonstrat[es] that it creates inconsistent regulation of activities that are inherently
national or require a uniform system of regulation, such as transportation or professional sports
leagues."  *See* Def. Mot. at 15 (citing *Ass'n des Eleveurs*, 729 F.3d at 951-52 (quoting *Nat'l Ass'n of
Optometrists*, 682 F.3d at 1148); *Chinatown Neighborhood Ass'n*, 794 F.3d at 1146-47).  Intervenors
repeatedly argue that "nondiscriminatory statutes are only found to impose substantial burdens on
interstate commerce where they regulate activities that are inherently national or require a uniform
system of regulation."  *See* Int. Mot. at 8-9 (citing *Nat'l Ass'n of Optometrists*, 682 F.3d at 1148).

But a substantial burden on commerce can arise in more than just these two ways.  Movants'
own citations establish that the "extent of the commercial activities foreclosed" by a challenged statute
must be considered when determining whether a burden is substantial.  *Cf. Pac. Nw. Venison Produ-
cers v. Smitch*, 20 F.3d 1008, 1010, 1015-16 (9th Cir. 1994) (holding that plaintiff failed to make
showing of substantial burden where record lacked "any indication of the extent of the commercial
activities that have been foreclosed" by ban on sale of "deleterious toxic wildlife" or whether "these
regulations will have any economic effect on consumers or members of the industry in other states and
countries"); *see also Safari Club Int'l v. Becerra*, 702 F. App'x 607 (2007) (looking to "numeric"
impact of ban but finding no substantial burden based on only 140 persons who said they were inter-
ested in possessing mountain lions in California).  And while Movants would have this Court believe

that "total bans" have been blessed in other Commerce Clause contexts, their cases do not support that notion.  *See* Int. Mot. at pp. 9-10, citing *Nat'l Pork Producers Council v. Ross*, No. 19-CV-02324 W (AHG), 2020 WL 1984058, at *5 (S.D. Cal. Apr. 27, 2020), which found no *Pike* violation because statute allowed sale of pork so "there are no barriers to the flow of pork across state lines."  Given *Pike*'s (and other courts') consideration of the economic impact of a challenged restriction commerce, it is simply wrong to assert that "[l]ost revenue from the sale of fur garments in San Francisco, even assuming it is 'substantial,' is irrelevant to the Pike analysis."  *See* Int. Mot. at 10:16-17.[6]

Here, San Francisco's Fur Ban imposes a substantial burden on interstate and foreign commerce.  Indeed, there can be no more substantial a burden on commerce than a total ban on it, which is what the Fur Ban places on fur products that are sold or so much as distributed in San Francisco.  "States may not impose undue burdens on interstate commerce."  *South Dakota v. Wayfair*, 138 S. Ct. 2080, 2091 (2018).  IFF has sufficiently alleged that a total ban on tens of millions of dollars of products from a global industry that produces those products almost entirely outside of California is a substantial burden on interstate and foreign commerce that clearly exceeds any putative local benefits.  *See* FAC ¶¶ 26-27, 65-67, 72-74.

**E.     Any Legitimate Interests Sought to Be Effectuated Locally by the Fur Ban Could Be Promoted by Multiple Alternative Means with Far Lesser Impacts on Commerce.**

Based on the allegations in the FAC, the balancing in this case should not even be a close call. *See* FAC ¶¶ 67, 74.  But even if it were, *Pike* requires the Court to consider whether the government's putative local interest "could be promoted as well with a lesser impact on interstate activities" so as to determine "the extent of the burden" on commerce "that will be tolerated."  *Pike*, 397 U.S. at 142. Contrary to Defendants' claims, the availability of alternatives is not "legally irrelevant."  *See* Def. Mot. at 23:1-16.  Here, the availability of even more effective alternatives with far less draconian impacts on commerce in fur only further warrants entry of summary judgment in IFF's favor.  *See* FAC ¶¶ 68, 75.  The Supreme Court has looked critically at restrictions that operate as an "outright

---

[6]     The Supreme Court has long recognized that appropriate review of local laws for their burden on commerce calls for the kind of *evidentiary* record that is beset developed at trial.  *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 155-56 (1963).

ban," even if applied to both in-state and out-of-state products and even if enacted to protect human consumers. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 353-54 (1977) (explaining that multiple "alternatives to the outright ban of Washington State grades are readily available").

Even if the Fur Ban did confer any putative local benefits, whether as an exercise in virtue-signaling or otherwise, the San Francisco Board of Supervisors' interest in expressing its dislike of fur products could be promoted just as well — or even better — without a complete market ban. *See* FAC ¶¶ 68, 75. Such alternatives include but are not limited to passing a resolution expressing whatever unfavorable views the Board has about fur, as it has done in the past with a resolution "[u]rging San Franciscans not to purchase eggs produced by caged hens and opposing the factory farming practice of confining egg-laying hens in battery cages." S.F. Resolution No. 20-08. Or the Board could more publicly express "promote community awareness of animal welfare." Indeed, as compared to the mere absence of genuine fur products from store shelves (which projects no message at all), a single billboard in Union Square telling consumers not to buy fur (pointing them to a website with the text of the "Findings and Purpose" section of the Fur Ban) — or perhaps even telling them to "Go Vegan" — would do more for the City's putative interest in bolster[ing] the City's stance against animal cruelty."

Or San Francisco could even require all sellers of fur products to make certain disclosures as to whether their products have obtained certification from WelFur or FurMark — or any other indicator of their compliance with animal welfare standards. *See* FAC ¶¶ 68, 75. Or, to the extent that San Francisco genuinely believes that shoppers should avoid purchasing natural fur products and instead keep warm with fake fur from petroleum, it could tax the former and subsidize the latter.

It is notable that, for bottled water — which the City similarly declared "bad for the environment," adding to "greenhouse gas emissions," and "potentially a health hazard" — the City believes it can be "a good environmental steward *without banning it*" but instead "promoting water conservation efforts and educating residents" about the benefits of tap water. S.F. Envt'l Code §§ 2301 *et seq*. Similarly, for meat and poultry raised using antibiotics, the City believes it "can play a pivotal role" not by banning it but by "explaining the myriad policies" on such use. S.F. Envt'l Code §§ 2701 *et seq*. In any event, as compared to any of the alternatives above, it goes beyond overkill to do what San Francisco has done here in imposing a categorical ban on interstate and foreign commerce.

**CONCLUSION**

For the foregoing reasons, Defendants' and Intervenors' motions to dismiss should be denied. If, for any reason, this Court should grant either or both motions, IFF respectfully requests leave to amend its Complaint.

Respectfully submitted,

Dated: May 27, 2020                    /s/ Michael Tenenbaum

Michael Tenenbaum, Esq.
*mt@post.harvard.edu*
THE OFFICE OF MICHAEL TENENBAUM, ESQ.

*Counsel for Plaintiff International Fur Trade Federation*